## GREAT SOUTHERN LUMBER CO. v. WILLIAMS.*

(Circuit Court of Appeals, Fifth Circuit. February 17, 1927.)

### No. 4894.

**1. Limitation of actions ⬤⇒127(3)—Amendment setting out cause of action for unlawful conspiracy, imperfectly alleged in original petition, held not subject to prescription.**

Where original petition, filed within period of limitation, set out cause of action for unlawful conspiracy, although imperfectly, amendment alleging such cause of action *held* not subject to prescription because not filed within period of limitation.

**2. Death ⬤⇒60—Evidence of threats of violence to prevent apprehension held erroneously excluded on issue of unlawful killing during arrest.**

Where issue in action for damages for alleged unlawful killing of plaintiff's husband was whether party, a member of which killed deceased, went to his premises as peace officers to arrest persons there, or whether they went at defendant's instance to unlawfully kill deceased, testimony of threats that persons arrested intended to prevent apprehension by violence, if necessary, *held* relevant, and rejection thereof reversible error.

**3. Evidence ⬤⇒317(2)—Testimony of statement of third person of posse's intention to kill plaintiff's husband held inadmissible as hearsay.**

In action for damages for alleged unlawful killing of plaintiff's husband, admission of testimony of plaintiff as to statement by third person that posse had come to deceased's premises to kill him *held* erroneously admitted as being hearsay.

**4. Master and servant ⬤⇒302(3)—Employer is liable for assault committed by employee while engaged within scope of authority.**

Employer is liable for willful and criminal assault of employee, committed while he was engaged in acts within his function or scope of his authority, or when protecting employer's property.

**5. Master and servant ⬤⇒307—Employer is liable for unlawful killing, which employee knowingly aided and abetted during arrest authorized by employer.**

If employee knowingly aided and abetted unlawful killing of deceased, when going to deceased's premises to help make arrest under authority of employer, employer would be liable for such unlawful killing.

In Error to the District Court of the United States for the Eastern District of Louisiana; Benjamin C. Dawkins, Judge.

Action by Mrs. L. E. Williams against the Great Southern Lumber Company. Judgment for plaintiff (13 F.[2d] 246), and defendant brings error. Reversed and remanded for a new trial.

*Rehearing denied March 30, 1927.

H. Generes Dufour, of New Orleans, La., Benj. M. Miller, of Covington, La., Delos R. Johnson, of Franklinton, La., and Bascom D. Talley, of Bogalusa, La., for plaintiff in error.

Hiddleston Kenner, A. T. Higgins and Max M. Schaumburger, all of New Orleans, La., for defendant in error.

Before WALKER and BRYAN, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. This was an action for damages, brought in the District Court by the defendant in error (as plaintiff) against the plaintiff in error (as defendant), arising out of the alleged unlawful killing of the husband of the plaintiff and the father of her minor child, in whose behalf she sued as tutrix. The deceased husband and father was killed on his own premises by a policeman of the city of Bogalusa, on November 22, 1919, under the following circumstances:

The defendant had been for many years operating a sawmill in Bogalusa, and employed in it some 2,500 men, white and black. Friction had arisen between the defendant and its employees some months before the deceased was killed. There was no strike in force, but a shut-down, due to an accident to defendant's machinery, had thrown the defendant's employees, except its millwrights, out of work, and they had been idle for some weeks before deceased was killed. During this period, troubles had arisen between the workmen of defendant and itself and with the municipal authorities of Bogalusa. On one occasion, prospective employees of the defendant, arriving at the railroad station at Bogalusa, had been forced by laborers to re-enter the train from which they had debarked and to leave Bogalusa. On another occasion, certain laborers had been put in jail, and a crowd of their sympathizers had threatened to effect a jail delivery. There had also been disorders at meetings of the Bogalusa city commission at various times.

Due to these occurrences additional paid policemen had been employed by the city, and a voluntary citizen police force had been organized and sworn in by the city, and had been actually called into service upon one or more occasions before the killing of the deceased. At the defendant's sawmill, there was a whistle used during the operation of the mill, to notify its employees when quitting time had arrived. The commissioner of public safety of Bogalusa had arranged with

the superintendent of the defendant that, in case of disorder and the need to call upon the voluntary police force to quell it, the whistle should be sounded to notify the voluntary police to assemble at the city hall. The signal had been used for that purpose by the defendant's superintendent at the request of the municipal officers before the killing of deceased. On the day before the deceased was killed, a warrant for one Dacus, a negro, had been issued by the city on a charge that he was a dangerous and suspicious person. Dacus was not found at his home on the day the warrant issued. On the morning of the succeeding day, Dacus, in company with two labor sympathizers, both armed with shotguns, and with Dacus between them, walked down Columbia street in Bogalusa in a public way, and were seen to enter the premises of Lem Williams, the deceased, who was the president of Trades Council.

The chief of police of Bogalusa was notified by a policeman and by others that Dacus had been seen on the street in company with the labor leaders and had gone upon the premises of the deceased, Williams, with them. The chief of police then consulted with the commissioner of safety with reference to the situation, and the expediency of summoning the special and voluntary police to help execute the warrant on Dacus, and also warrants which were then issued for the two labor leaders. It was decided that it would be best to summon special officers to make the arrests. The special officers were to be summoned by the mill whistle, and word was sent to the superintendent of the mill to that effect. The superintendent caused the whistle to be blown to notify the special officers to report at the City Hall. Upon their assembling there, together with one Magee, who was a paid officer of the city to whom the warrants were given for execution, they went in company with the commissioner of safety to the premises of the deceased for the purpose of making the arrest. There were about 75 men in the party.

The evidence was conflicting as to how many were employees of defendant. The superintendent of the defendant was there, but whether he was armed or not was in dispute. The facts as to what transpired after the party had arrived, and while the warrants were being executed, were in conflict. The witnesses of the plaintiff testified that the deceased and others were killed by members of the party without warning or prov-

ocation. The witnesses of the defendant testified that the deceased, Williams, was notified that the purpose of the visit was to serve warrants on Dacus and the two labor leaders, and that deceased was called upon to put down a pistol, which he had, and permit the arrest to be made, and that he refused to do so; that a shot was fired from the inside of the office, at the door of which the deceased was standing; and that it was then only that the arresting party fired, killing the deceased and others.

The foregoing is a mere outline of the voluminous evidence in the record, but sufficient in view of the disposition we make of the appeal. The liability of the defendant depended upon whether (1) deceased was unlawfully killed; and (2) if so, whether defendant was connected with and legally responsible for his death.

The important questions presented by the 23 assignments of error relate to the second question. The theory relied upon by the plaintiff to connect the defendant with responsibility for the killing was twofold: (1) That there had been formed a conspiracy between the defendant, its officers and agents, and others, who were strangers to it, to kill the deceased, because he was objectionable to the defendant, because of his labor activities, and that his death resulted from the conspiracy, or that the defendant had knowingly aided and abetted strangers to it in the unlawful killing with the same motive; and (2) that the presence of officers and employees of the defendant, armed and participating in making the arrest, at the place where the shooting occurred, made the defendant responsible upon the principle of respondeat superior, for the death of the deceased.

The questions presented by the assignments of error may be grouped and discussed as follows: (1) Those relating to the amendments to the petition, made before and after verdict. (2) Rejection of evidence offered by the defendant as to what was said by O'Rourke and Bouchillon as they were walking along Columbia street with Dacus on the morning of the day of the killing. (3) Permitting Mrs. L. E. Williams, the plaintiff, and other witnesses to testify that Bob Carson stated to them that they had come there to kill the deceased and that they had done it. (4) The refusal of the District Court to direct a verdict for the defendant.

[1] I. The plaintiff, after the lapse of more than a year from the date of the deceased's

death, by leave of court, amended her petition. The contention of the defendant is that the amendment introduced a new cause of action, not contained in the original petition, and barred by the Louisiana prescription of one year. If the amendment is given the effect contended for by defendant, the new cause of action would, under the jurisprudence of Louisiana, have been prescribed by the limitation of one year. The contention of the defendant is that the original petition contained no cause of action based on an unlawful conspiracy between defendant and others to kill deceased, to remove him from defendant's path because of his labor activities. While the original complaint, as we construe it, set out the cause of action for unlawful conspiracy in too vague and uncertain terms to be good against exception, it did present, though imperfectly, such a cause of action, together with one based upon the principle of respondeat superior. We conclude that the cause of action for unlawful conspiracy was not subject to prescription at the time the amendment was filed.

After verdict and before judgment, the plaintiff further amended by striking out all the original defendants, except the Great Southern Lumber Company. As the individual defendants, so stricken, were citizens of Louisiana, as was the plaintiff, this amendment was necessary to give the District Court jurisdiction. The right of the plaintiff in proper season to so amend as to preserve jurisdiction is not questioned by defendant. It is contended that, after verdict and after the individual defendants, so dismissed, had testified as witnesses for the corporate defendant, affected with the interest of codefendants, it was too late to dismiss them as defendants. The conclusion reached by us makes a decision of this question unnecessary. Upon a subsequent trial, the individuals will not again appear before the jury as both witnesses and defendants.

[2] II. An important issue on the trial was whether the party, a member of which killed deceased, went to his premises to enforce the law as peace officers by the arrest of offenders, whom they believed were there, and against whom warrants were outstanding and in their possession, or whether they went there at the instance of defendants or its agents to unlawfully kill deceased to get rid of him. The defense of the defendant was predicated on a showing that the raid was in the interest of law enforcement, and the party or posse legally bent on serving the warrants with no ulterior motive. Clearly

in aid of this defense, defendant was entitled to show that an occasion had arisen and still existed calling for the enforcement of the law by the serving of the warrants for Bouchillon, O'Rourke, and Dacus, and the need for a number of officers, instead of a single one, to safely accomplish the arrest. If there had been a defiance of the law shortly before by Bouchillon and O'Rourke by threatening to protect Dacus by violence against arrest, this was a fact tending to show an occasion requiring the exercise of force to uphold the law and by a posse rather than by a single officer.

The trial judge permitted evidence tending to show that Bouchillon and O'Rourke paraded Columbia street, armed and with Dacus between them; but the court refused to permit witnesses to testify to threats asserted to have been made by Bouchillon and O'Rourke to prevent Dacus' apprehension by violence, if necessary, upon the ground that it was hearsay and immaterial. The issue was whether or not such threats had been in fact made, and the testimony of witnesses, who heard them made, is not hearsay. The making of the threatening statements, and not the truth of what had been said by the makers, was the inquiry. Permitting the defendant to show the parading of the street, while denying it the privilege of showing the unlawful character of the parade by the accompanying declarations of the paraders, was less than half a loaf. Plaintiff contended, and the District Judge charged, that Bouchillon and O'Rourke had the right to bear arms in the public street. The pertinent fact, therefore, was not that they had borne arms, but their purpose in doing so. Crime or innocence was to be determined by their purpose. If they had no intent to defy the law and protect Dacus from it by violence, no crime was committed and no occasion for a posse to make the arrest existed. If their purpose was to intimidate the police by threats of violent protection of Dacus against arrest, then they were committing a crime and one which could only safely be met by the summoning of a posse. A posse was summoned, a member of it killed deceased, and defendant was sought to be held liable for his death upon the theory that the party was not a posse, but an aggregation of strong-armed gunmen, assembled by defendant to unlawfully remove deceased. The relevancy of any declaration of Bouchillon and O'Rourke that might serve to illustrate the character of their march with Dacus is clear, for it was the criminal character and

not the march itself that would justify the issuing of warrants and the raising of. a posse to execute them. The evidence rejected was neither hearsay or irrelevant. Its rejection was error, and the injury resulting to the defendant serious enough to require a reversal of the judgment.

[3] III. The court below, over the objection and exception of the defendant, permitted the plaintiff and others to testify that one Bob Carson subsequently introduced as a witness for defendant said to her in the presence of others that they (referring to the posse) had come there to kill her husband and had done it. The admission of this evidence is sought to be justified both as the statement of a conspirator against the defendant, a co-conspirator, and as a res gestæ declaration of an agent binding on his principal. Carson had not been examined when the evidence was admitted, and it was not offered to impeach him, but as an admission against interest of the defendant. We think the court erred in admitting this evidence. It was not the declaration of a co-conspirator. The record fails to establish any conspiracy between the defendant and Carson with reference to the deceased. Again, if there had been a conspiracy between them, the object of which was to kill deceased as charged, the conspiracy was ended by the death of deceased, before the statement asserted to have been made was made by Carson. All the shooting was over, the brother of deceased had already been rescued, and O'Rourke, who was wounded, was being put in a car to be taken to a hospital. Carson had been placed at the gate of the deceased's premises to keep order. The statement itself was not a verbal act. It was not made to carry out the conspiracy, but was a mere narration of what had already been done and of its purpose. It was not part of the res gestæ. Carson was not even employed by the defendant. The evidence of the plaintiff to that effect shows on its face that she had no knowledge that would qualify her to testify to his employment. Carson and all other witnesses denied such employment. If Carson was not employed, his declaration, whenever made, would not be binding on the defendant. It was the hearsay of a stranger to defendant, made after the transaction, and narrative of it, and the court erred in admitting it.

[4, 5] IV. The District Judge denied the request of defendant for a directed verdict. Upon a subsequent trial, the evidence may differ from that presented in this record, and it is unnecessary to pass upon its sufficiency to establish either or both of the grounds of liability, relied upon by plaintiff to connect the defendant with the killing of the deceased. We do not think the present record contains direct evidence of a conspiracy between the defendant through its agents and strangers to kill deceased. There is evidence tending to show that Guerre, the superintendent of the defendant, caused the whistle signal to be given, when requested by the city authorities, and that he was at the place of the shooting armed, when the shooting occurred, though this was denied by him. An employer is liable for the willful and criminal assault of an employé, committed while he is engaged in acts within his function or the scope of his authority, as, when protecting his employer's property from trespass or destruction. What the employé does, that is beyond the subject-matter committed to him by his employer, does not bind the employer. In this case, the evidence tended to show that Guerre was helping to arrest Dacus and the two labor leaders. No express authority to do so is shown to have been conferred upon him by the defendant. A previous course of conduct on defendant's part, from which the authority for its superintendent to assist the police in making arrests could be inferred, would have to be shown. It would also have to appear that the authority was exercised for the benefit of the defendant, as distinguished from the duty of the citizen. If Guerre went to the premises of the deceased to help make the arrest and had been authorized by the defendant to make arrests in its interest, and knowingly aided and abetted in an unlawful killing of deceased, the defendant would be liable, but not otherwise.

For the reasons assigned, the judgment is reversed, and the case remanded to the District Court for a new trial in conformity with the opinion.

Reversed and remanded.