Marcus CASBON
v.
WATERMAN STEAMSHIP CORPORATION and Waterman of Puerto Rico, U. S. A., Inc.

Civ. No. 12833.

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 23, 1967.

Max Zelden, Zelden & Zelden, New Orleans, La., for plaintiff.

George W. Healy, III and James Hanemann, Jr., Phelps Dunbar, Marks, Claverie & Sims, and F. Irvin Dymond, New Orleans, La., for defendants.

John R. Peters, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for intervenor.

## MEMORANDUM OF DECISION

COMISKEY, District Judge.

On November 9, 1961, the plaintiff, Marcus Casbon, a Sieracki seaman, was working aboard the defendant's vessel the S/S Monarch of the Seas as a longshoreman/carpenter in the actual employ of intervenor and third party defendant, Ryan Stevedoring Company. He was lashing down cargo between the No. 2 and No. 3 hatch on the forward deck around 9:15 at night as a member of a longshoreman/carpenter gang consisting of several other fellow workers, the Foreman, Charles Cefalu, and the Superintendent, Matthew Soulin.

The night was cold and dry. The vessel was under the command of Third Mate, George E. Odum, Deck Officer. Odum was a superior in all respects to the plaintiff Casbon. He was the deck officer in charge. Odum on duty that night became convinced that the longshoremen/carpenters were throwing the ship's gear, namely, turnbuckles, overboard, and in an effort to protect his employer's property, proceeded on to the deck to investigate and put an end to this practice. Odum first accused a longshoreman/carpenter who persisted in a denial and Odum cursed him; Odum proceeded to accuse another longshoreman/carpenter, and when he also persisted in a denial, Odum cursed him, too. Then Odum took up the matter with Foreman Cefalu near and in the hearing of the plaintiff, who then asked Odum to get out of his way so he could lash cargo with a turnbuckle. When interrupted in his conversation with Foreman Cefalu by plaintiff's request, Odum answered with an obscenity. Casbon retorted with a stronger obscenity about Odum's mother, and Odum quickly demanded that the Foreman put Casbon off the ship, but the Foreman argued that he would have to discuss such a matter with Superintendent Soulin. At this point, Odum was tired of being thwarted in his command and direction of the ship and struck plaintiff, who was doing his work lashing chains to cargo with turnbuckles in a crouched position.

Upon being assaulted by Odum, Casbon first tried to remove his jacket to make his defense more efficient, and while trying, was struck again by Odum, and

plaintiff decided to take Odum on without taking his jacket off. Both participants swung at each other, and here the evidence is in hopeless conflict as to who landed the most blows and how many in fact were landed; but one thing is certain, the plaintiff using his 'power punch' finally swung at Odum, who ducked, fortunately, and plaintiff's clenched right fist struck the very chain which he had been lashing to the cargo causing injury to his hand.

Thereafter, a second fight took place on the dock between the two with the plaintiff emerging as the obvious victor, but with Odum promising at some later date "to get even". The injuries complained of occurred on the vessel and what punches were landed on the dock and what injuries, if any, occurred in the dock fight are not really an issue.

Odum's assault on the plaintiff climaxed the quick flow of events during which Odum pressed zealously his search for the guilty longshoreman/carpenter who had thrown turnbuckles overboard, and the presence of Casbon while Odum was complaining to Foreman Cefalu and the request by Casbon for Odum to get out of the way so he could proceed with his work was too much for Odum to take. His zeal to do his duty exploded into an assault. This court is convinced, despite Odum's denial, that his quickness of fist no doubt was prompted in part by the fact that he had had his share of alcoholic beverage before returning to the vessel that night at 7:00 p. m. to stand watch at 8:00 p. m. however, the evidence is also convincing that Odum was not drunk to a point of loss of command of his faculties.

At all times Odum was acting in the course and scope of his employment for his employer, the vessel owner, and in an effort to ferret out the guilty longshoremen/carpenters and to protect the vessel's gear, he went too far in his discipline of those under him by abusing with curse words the first longshoreman/carpenter, and then abusing with curse words the second longshoreman/carpenter, and then by cursing and assaulting the third longshoreman/carpenter, the plaintiff Casbon. Probably his employer would not have wanted such vigorous disciplinary action as Odum engaged in to discover the longshoreman/carpenter throwing turnbuckles over, but the vessel owner got that degree of effort from its desk officer, Odum, that night whether the defendant wanted it or not.

Odum's version is that for no rhyme or reason known to Odum the plaintiff without any provocation suddenly came from behind, and cursed him and assaulted him, but this strikes the court as an unlikely story. Odum that night was in charge of keeping the log, but failed to record in the log any information about the theft or destruction of turnbuckles by longshoremen/carpenters, or anyone else, and gave as a reason for omitting this from the log that he felt sorry for these longshoremen/carpenters.

In addition to the assault on the plaintiff, Odum was charged with assault about a month later on another fellow crew member of the S/S Monarch of the Seas and he was placed on probation. He also testified to having a fight with a mess boy some time shortly after the November incident, but claimed that the mess boy was to blame.

Plaintiff seeks recovery based on unseaworthiness and negligence by respondeat superior alleging that Third Mate Odum was acting in the course and scope of his employment for the vessel owner when he assaulted the plaintiff. The Fifth Circuit in Clevenger v. Star Fish and Oyster Co., 325 F.2d 397 (1963) was confronted with an assault by a seaman upon a fellow worker. A devil's fork was plunged into the man's back and the court held the attack constituted a breach of the warranty of seaworthiness. The case reviewed the jurisprudence on unseaworthiness in assault cases and even though the suit was principally a suit under the Jones Act charging negligence by the ship owner, it also included the charge of unseaworthiness of the ship. The court found favorably for the plaintiff on the doctrine of unseaworthiness and

484

noted the broadness of this remedy when it said:

> "When the action for unseaworthiness is available, this notion of liability swallows up any notion of maritime negligence, no matter how leniently conceived. We see no need, therefore, to discuss negligence."

■ In our case Odum did not use a dangerous weapon in the assault; and Odum's conduct before and after the assault does not convince the Court that he has a proclivity to be pugnacious as defined in Boudoin v. Lykes Bros., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354. However, using the rational of Keen v. Overseas Tankship Corp., 194 F.2d 515 (1952), 2d Cir. and *Boudoin* and Walters v. Moore-McCormack Lines, Inc., 309 F. 2d 191 (1962) 2d Cir., the very fact of an assault by a superior officer like Odum on longshoreman Casbon might constitute unseaworthiness. This view is strengthened when we answer Justice Douglas' question in *Boudoin*, "Was the assault within the usual and customary standards of the calling?"

■ Here the assault by a superior officer on Casbon can hardly be considered within the usual and customary standards of a deck officer in charge of this vessel. But rather than go into this, the court feels very strongly that liability of the vessel owner here can best be assessed by finding that Third Mate Odum was acting within the course and scope of his employment when he assaulted Casbon. A master is responsible for the acts of his servants on land and on the sea under the theory of maritime negligence which may or may not have been swallowed up by the broader remedy of unseaworthiness.

In Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082 (1930) when longshoremen were treated as seamen under the Jones Act, the Supreme Court found the vessel owner liable for negligence of a foreman authorized by the vessel owner to direct the crew and to keep them at work. When the foreman assaulted the plaintiff longshoreman without provocation in an effort to

hurry the longshoreman about his work, the question was whether "negligence" included the assault in question. The court reviewed the question of wilful torts and concluded that a wilful tort was included in the negligence cause of action under the Jones Act and concluded as follows:

> "While the assault of which plaintiff complains was in excess of the authority conferred by the employer upon the foreman, it was committed in the course of the discharge of his duties and in furtherance of the work of the employer's business."

The Court reasoned that if an employer is responsible for the negligent torts of its employees, then certainly the employer should be liable for the wilful torts of its employees. This same principle was recognized in Alpha S.S. Corp. v. Cain, 281 U.S. 642, 50 S.Ct. 443, 74 L.Ed. 1086 (1930).

The liability of an employer for the wilful acts of his employee under the doctrine of respondeat superior was further recognized in Lykes Bros. S.S. Co. v. Grubaugh, 5th Cir. 1942, 128 F.2d 387 which held the vessel owner liable under the Jones Act for damages inflicted on the plaintiff steward of the vessel by the negligence of the chief engineer and an assistant engineer. At p. 391, the following quote is pertinent to our case.

> "The law governing the responsibility of the master for an injury from a beating administered by one employee to another * * * is that under the doctrine of respondeat superior there is no liability for a wrongful assault committed by one employee on another unless the assault is committed, whether wisely or unwisely, in furtherance of or in an attempt to further the master's business or in other words in connection with some act which an assaulter is authorized to do for the master. In any case where the act is merely a wanton and wilful act done to satisfy the temper or spite of the employee, the master is not liable * * * In each of those cases the assault was by a superior officer upon a subordinate

employee whom the assailant had the power and authority to direct, control and discipline. No case has held a steamship company liable for an assault committed by a subordinate employee upon his superior or by the head of one department upon the head or an employee of another department over whom the assailant has no authority of direction or control. None has held the master liable where as here the assault occurred as the result of anger over matters having nothing to do with the exercise, over the assailed, of authority delegated by the master to the assailant in the discharge of duties with which the master had charged him."

■ *Jamison, Alpha,* and *Grubaugh* were concerned with Jones Act negligence but negligence as a maritime tort is analogous.

In Great Southern Lumber Co. v. Williams, 17 F.2d 468, 5th Cir. (1927), this liability of employers for the wilful torts of their employees was recognized in a non-admiralty case and recognized the rule as follows:

"An employer is liable for the wilful and criminal assault of an employé, committed while he is engaged in acts within his function or the scope of his authority, as, when protecting his employer's property from trespass or destruction."

In the instant case, the act of Odum was not a private quarrel or dispute with Casbon, but rather the wilful acts of Odum were done on the assertion of his authority as the desk officer in command of the vessel. Applying the law, therefore, to the facts, we conclude that the plaintiff is entitled to a judgment against the defendants on the question of liability which was the sole issue in this trial, since it was stipulated by all parties under Rule 42 F.R.Civ.P. that the separate issue of liability would be tried at this time and the question of quantum, if any, would be reserved for later disposition. The trial also included the rights of third party defendant and intervenor, Ryan Stevedoring Company, who is interested

in holding the defendants liable in order to receive back compensation paid the plaintiff. Intervenor is entitled to reimbursement out of any sums to which the plaintiff may be entitled. All of this must wait until the trial on quantum.