**GERMAN v. CARNEGIE–ILLINOIS STEEL CORPORATION.**

No. 9601.

Circuit Court of Appeals, Third Circuit.

Argued June 11, 1948.

Decided Aug. 13, 1948.

Ira R. Hill, of Pittsburgh, Pa. (Ira R. Hill, Reed, Smith, Shaw & McClay, of Pittsburgh, Pa., on the brief), for appellants.

Hymen Schlesinger, of Pittsburgh, Pa. (Schlesinger & Schlesinger, of Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, GOODRICH, and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

Plaintiff, a seaman, brought action below on the law side to recover cure and maintenance, and damages by reason of unseaworthiness of the vessel, under the admiralty and maritime laws; also damages under the Jones Act, 46 U.S.C.A. § 688, by reason of negligence. The three-pronged action was tried before a jury which rendered a verdict in German's favor in the amount of $4,011. Defendant's alternative motions for a new trial or for judgment in its favor notwithstanding the verdict, were denied by the trial court.

The defendant urges here, as it did in the court below, that the trial judge should have given binding instructions in its favor in view of the fact that the plaintiff had executed a release in consideration of the receipt of a payment of $2,500. The defendant also contends that at the trial it sustained the burden, imposed upon it by law, of establishing that the release was valid.

Before discussing the question of law essential to the determination of the issue here involved it is desirable to make the following summary statement of the evidence adduced at the trial:

Plaintiff is a riverman of about 40 years' experience. He was first employed by the defendant in 1922, then "on and off." Beginning in 1937, he worked continuously for the defendant for some seven years as deckhand and fireman. In January, 1944, he was assigned to duty as a striker-engineer. His principal duty was to oil and grease the engines. To do so he was required to move on and along a foot box or foot board placed in front of the engines. On or about April 15, 1944, he slipped and fell from the foot box to the deck, suffering the injuries later described. The plaintiff attributed the occurrence to the negligence of a fellow-seaman in dropping oil and grease on the foot box and in failing to remove it. He asserted, too, that the failure of the defendant to provide a grab bar or guard rail for safety while moving along the foot box, which was frequently oily and greasy, constituted unseaworthiness of the vessel.

According to the plaintiff, he suffered at the time head and other body injuries as the result of his fall. Nevertheless, he continued to work until May 5th when he went on a five-day shore leave in the course of his regular routine.[1]

On May 8th, while walking on the street in Pittsburgh, Pennsylvania, the plaintiff was stricken unconscious. He was taken to the Allegheny General Hospital, Pittsburgh, where he remained until May 12th. He was then taken to the United States Marine Hospital near Pittsburgh, where he remained until June 29th. He was an outpatient of that hospital from the latter date until August 28th.

During the latter period, in mid-August, plaintiff returned to work for the defendant for about a week. However, he was compelled to leave because of his physical condition and was thereafter unable to do any kind of work. On September 20th, he entered the United States Veterans' Hospital at Aspinwall, near Pittsburgh, where he remained until October 19th. The record does not disclose any further hospitalization or out-patient treatment.

The medical testimony on both sides was to the effect that plaintiff, who was 55 years old at the time, had suffered a cerebral thrombosis on May 8th, with an attending paralysis which eventuated in the loss of use of his left arm and the left side of his body. There was no question but that the plaintiff was thereafter totally and permanently disabled. But there was sharp disagreement as to whether the accident on April 15th was the cause of the cerebral thrombosis. Plaintiff's medical testimony said it was. Defendant's medical testimony was to the contrary, attributing the thrombosis to a pre-existing arteriosclerosis and myocarditis. In connection with the latter, a Dr. Bloom of the United States Marine Hos-

[1] According to ship routine the men usually stayed on the vessel 10 days and then had five days off and then came back to work for another 10 days, etc.

pital staff testified that the plaintiff had been hospitalized during December, 1943, for a coronary attack and that the basis of the diagnosis was "arteriosclerosis". The hospital record disclosed that on December 28, 1943, the plaintiff had been given a certificate stating that he would be "fit for duty" about January 1, 1944. It was at the later time that plaintiff returned to work for the defendant as a striker-engineer aboard the "Perry," which plied the Ohio, Monongahela and Allegheny Rivers.

There was also testimony of a Dr. Huber, a neuropsychiatrist of the Veterans' Hospital, relating to the plaintiff's condition during his hospitalization in September and October, 1944. In attributing the plaintiff's condition to the April 15th accident, Dr. Huber said he had suffered "damage to his brain" and that "he has now evidence of mental deterioration to the degree that he is not as alert as one should be for his age." (N.T. pages 225, 226).

As to the release in question:

Prior to the institution of the action now under review, the plaintiff had filed four other suits based on the April 15, 1944, accident.

The first action was brought in the Court of Common Pleas of Allegheny County, Pennsylvania, under the Jones Act. After introducing evidence as to liability, the plaintiff suffered a voluntary non-suit. He subsequently filed Civil Action No. 3937 in the District Court for the Western District of Pennsylvania, under the Jones Act, for damages and for maintenance and cure. Later he filed Civil Action No. 4827 in the same Court charging negligence under the Jones Act and unseaworthiness under general maritime principles. The latter case came to trial and there was a verdict for the defendant. We reversed and remanded for a new trial, 156 F.2d 977, on the ground that the trial court had erred in requiring the plaintiff, in the presentation of his case, to "elect" as between his two causes of action. The plaintiff had "elected" under the trial court's ruling to proceed on the theory of negligence under the Jones Act.

While Civil Action No. 4827 was pending, plaintiff filed Civil Action No. 5573 in the District Court for the Western District of Pennsylvania for maintenance and cure.

On September 19, 1946, a month after we ordered a new trial in Civil Action No. 4827, the plaintiff telephoned defendant's counsel and asked whether any offer had been made to his attorney in settlement of his various suits. He was advised that plaintiff's counsel had some time previously been offered $2,500.

Plaintiff discussed the situation with his counsel, who advised him that he had rejected the offer as insufficient. Although plaintiff stated "I am broke and need the money, let's take it" (N.T. page 121), his counsel refused to make the settlement. Plaintiff, together with one Graham, a constable, then went to the office of defendant's counsel and sought to settle. Defendant's counsel refused to do so and telephoned plaintiff's counsel advising him of the situation. The following day, September 20th, plaintiff, his counsel and Graham met in the office of defendant's counsel again plaintiff's counsel advised against settlement; plaintiff insisted on it "because I needed the money. I was broke." (N.T. page 122). The settlement was made and, following execution of the release, a check for $2,500.00, to the joint order of plaintiff and his counsel, was delivered.

Plaintiff testified that he had "read a lot of" the release but that "as bad as I needed money, I would have done anything" (N.T. page 134). He stated that no one connected with the defendant, including defendant's counsel, had in any way "forced," "compelled" or "tried to get" him to settle the case and execute the release. However, he also testified that prior to the settlement he had been threatened with arrest by Graham, the constable, in connection with an outstanding grocery bill of $113.00, which had been placed in Graham's hands for collection. The grocery bill was paid to the constable out of the proceeds of the settlement.

Defendant contends that on these facts, and in view of the absence of any allegation or proof, of fraud, accident, mistake or deception in the execution of the release in question, it was entitled to binding instructions in its favor in the court below. It

urges that, in any event, it is entitled to a new trial on the ground that the trial court erred in submitting to the jury the "question of the adequacy of the consideration paid to the plaintiff and the matter of whether or not the plaintiff understood his rights at the time he executed the release in question."

Plaintiff, in reply, contends that the trial judge properly submitted the issues to the jury and that the latter's findings were in accordance with the weight of the evidence.

We are of the opinion that on the facts of this case the trial court did not err in refusing to give binding instructions in favor of the defendant, that it properly submitted the issues to the jury and that the latter's verdict was in accordance with the weight of the evidence.

■ As was stated in Garrett v. Moore-McCormack Co., 1942, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239, under the prevailing rule treating seamen as wards of admiralty there is a close analogy between seamen's contracts and those between fiduciaries and beneficiaries. Said the court, 317 U.S. at page 247, 63 S.Ct. at page 252:

"Whether the transaction under consideration is a contract, sale, or gift between guardian and ward or between trustee and cestui, the burden of proving its validity is on the fiduciary. *He must affirmatively show that no advantage has been taken; and his burden is particularly heavy where there has been inadequacy of consideration.*" (Emphasis supplied)

With respect to seamen's releases, the court enunciated the following rule, 317 U.S. at page 248, 63 S.Ct. at page 252:

*"Such releases are subject to careful scrutiny.* 'One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the *release as fairly made with and fully comprehended by the seaman.'* Harmon v. United States, 5 Cir., 59 F.2d 372, 373. We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was *executed freely, without deception or coercion,* and that it was made by the seaman with full understanding of his rights. *The adequacy of the consideration* and the nature of the

medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding.

"This general admiralty rule applies not only to actions for maintenance and cure but also to actions under Section 33 of the Merchant Marine Act. *That law is to be liberally construed to carry out its full purpose, which was to enlarge admiralty's protection to its wards."* (Emphasis supplied.)

The "careful scrutiny" to which releases are subject discloses the following situation in the case *sub judice:*

■ Putting aside for the moment the accident on April 15, 1944, it is of paramount importance to note that the plaintiff was stricken while on shore leave on May 8, 1944. He thereupon became entitled to maintenance and cure: Aguilar v. Standard Oil Company, 1943, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107; Nowery v. Smith, D.C.1946, 69 F.Supp. 755, which we affirmed 3 Cir., 1947, 161 F.2d 732; Smith v. United States, 4 Cir., 1948, 167 F.2d 550.

■ The plaintiff was hospitalized from May 8th until June 29th. He was an outpatient of the United States Marine Hospital in the following two months during which he worked only one week, so that he was entitled to maintenance for the balance of that period—seven weeks. He was further entitled to maintenance and cure for the following three weeks until he entered the United States Veterans Hospital on September 20th, where he remained until October 19th. Since he received no further hospitalization after that date, nor did he work between then and September 20, 1946, when the release was signed, he was entitled to maintenance and cure for that period. The parties at the trial stipulated maintenance and cure at $3.50 a day. Taking into consideration the 23-month period between October 19, 1944, and September 20, 1946, and the prior seven and three week periods mentioned, there was at that time due the plaintiff for maintenance and cure, approximately $2,700. That sum compares with the $2,500 which he received in settlement not only of his claim for maintenance and cure but also

for pain and suffering, loss of wages to that time, and future loss of earnings due to his total and permanent disability.[2]

This brief scrutiny demonstrates the sheer inadequacy of the settlement. But it has an even more significant aspect: The subjection of this crippled plaintiff to what must have been to him crushing economic duress, deprived as he was of any income over a period of two years during which the defendant failed to pay him the maintenance and cure to which he was entitled by law.

The extent of that economic pressure is amply illustrated by the incident of the constable's threat to arrest the plaintiff for an unpaid $113.00 grocery bill. When he made the settlement and signed the release, the plaintiff was "broke," "needed the money," and "would have done anything." In the light of the defendant's failure, even in the face of his various law suits, to pay this 55-year old totally disabled plaintiff a single dollar of maintenance and cure over a two-year period in flagrant violation of an obligation imposed by law, the assertion that it did not exercise "undue influence" or coercion in effecting the settlement, is little less than specious.

There was another vital piece of testimony, not mentioned by the District Court in its charge to the jury or in its opinion denying the defendant's motions, which alone would have justified the jury's finding that the release was invalid. That piece of testimony was Dr. Huber's statement that the plaintiff had suffered "damage to his brain" and that "he has now evidence of mental deterioration."

Defendant has confined this appeal to the question of the release so that we are not concerned with the issues of negligence and unseaworthiness nor with the amount of the verdict. As to the latter, it need only be pointed out that it reflected a credit, in accordance with the trial judge's instructions, for the $2,500 received by the plaintiff in the settlement. The plaintiff did not move for a new trial. He has withdrawn an application to this Court to increase the jury's

award so that there remains for disposition only the plaintiff's request that we impose a penalty in the amount of 10 per cent on the ground that the instant appeal is "dilatory." That request is denied.

For the reasons above stated, the judgment and orders of the Court below will be affirmed.

---

[2] With respect to loss of wages and future earnings, the testimony disclosed that plaintiff's wages had been $9.42 a day; there was a life expectancy of 17 years.