William **THOMPSON**

v.

**COASTAL OIL COMPANY,**
Appellant.

No. 11315.

United States Court of Appeals, Third Circuit.

Argued Oct. 11, 1954.

Decided Jan. 28, 1955.

Rehearing Denied April 22, 1955.

Biggs, Chief Judge, and McLaughlin, Circuit Judge, dissented on denial of petition for rehearing.

Michael E. Hanrahan, New York City (Hanrahan & Brennan, New York City, on the brief), for defendant-appellant.

John A. Gleason, New York City (Silas B. Axtell, New York City, Martin G. Stein, Brooklyn, N. Y., on the brief), for plaintiff-appellee.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

This is a seaman's action instituted against defendant ship owner to recover damages for an assault by a member of defendant's crew. The case was presented below upon a complaint for (a) negligence under the Jones Act, 46

U.S.C.A. § 688; (b) unseaworthiness under the admiralty and maritime laws; (c) maintenance and cure.[1] The District Court, sitting without a jury, held a previously negotiated release for $4,000 invalid, and entered judgment for the plaintiff in the sum of $16,000. 119 F.Supp. 838.

The relevant facts are as follows: plaintiff Thompson, a veteran ship's cook, was employed on one of defendant's tankers. On January 12, 1950, Thompson claims to have seen one Medina, a crew messman, engaged in a homosexual act with two other members of the crew. He immediately reported the matter to the chief steward and to the union delegate. On January 13, 1950, a union meeting was called to decide whether the incident should be reported to the Coast Guard or Medina compelled to leave the ship. Medina left the meeting a few minutes before the group dispersed. Some short time later Thompson, as he turned the corner on the boat deck, was struck from behind on the head by a meat cleaver wielded by Medina.

Thompson was removed from the ship on January 15, 1950, and taken to the Marine Hospital at Corpus Christi, Texas. He remained at this institution until February 10, 1950. Then followed periods of hospitalization at various Marine hospitals:
New Orleans  February 10 to March 18
Galveston, Texas March 20 to March 21
Galveston, Texas March 25 to April 1
Stapleton, Staten Island April 9 to April 28. His condition was diagnosed as "Encephalopathy due to trauma" or "disease of the brain caused by wound or injuries."

After his discharge from Stapleton on April 28, 1950, the plaintiff lived for a few days at the Seaman's Church Institute on South Street, New York. He then voluntarily called on defendant's agents, where after complaining of head pains, he expressed a desire to go to Hot Springs, Arkansas for a period of rest. Defendant's agents asked him how much he needed for this purpose and in accordance with the plaintiff's request gave him $300.00.

Three weeks later he returned and at defendant's suggestion was examined by Dr. Charles A. Farr on May 18, 1950. Dr. Farr reported that the plaintiff had a ten percent permanent disability and would not be able to work for three months. The prognosis made by the Stapleton Hospital had been for a "good recovery", and that institution suggested he would be able to work on May 29, 1950 or nearly three months earlier than had been suggested by Dr. Farr, the defendant's own physician.

Thompson was then sent to one Mr. Barron of the Shipowners Claims Bureau, an organization which adjusts claims for shipowners. There he signed a release of all claims arising out of the assault for $4,000. During this negotiation plaintiff was not represented by counsel.

Since the signing of the release plaintiff has continued to suffer from the effects of the head blow, having been hospitalized at New Orleans from November 13, 1952, to December 15, 1952, and at Stapleton from February 16, 1954 to February 23, 1954. In fact, Thompson is still receiving out-patient treatment.

While he has procured work at levels of remuneration and status above and below that which he commanded prior to the assault, it is patent that his injuries have proved more serious than was thought at the time of the release.

We are of the opinion that the District Court committed error in striking down this release. We therefore confine our discussion to this facet of the appeal.

Garrett v. Moore-McCormack Co., 1942, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239, is the leading authority as to the criteria by which the conclusive-

---

1. The issue as to maintenance and cure was not pressed below and does not form part of this appeal.

ness of a release is to be judged. From that case the following principles emerge:

(1) The burden of proving the validity of a release rests upon one who sets up the release and this burden can be carried only by showing that "it was executed freely, without deception or coercion." 317 U.S. at page 248, 63 S.Ct. at page 252.

(2) The release must be shown to have been fairly arrived at and made by the seaman with a full understanding of his rights.

(3) "The adequacy of the consideration and the nature of the medical and legal advice available to the seaman *at the time of signing the release* are relevant to an appraisal of this understanding." (Emphasis supplied.) 317 U.S. at page 248, 63 S.Ct. at page 252.

Viewed by these standards we think the release here in issue is binding. The settlement of $4,000 was generous when considered in the light of the medical reports. True, the plaintiff is now known to have suffered to a greater extent than was previously thought. But the very nature and purpose of settlement presupposes a joint *approximation* of the future. The validity of a release is not conditioned upon the prescience of the parties.

The District Court based its ruling in part upon the grounds that the plaintiff was not represented by counsel nor was he examined by a physician of his choosing. As to lack of counsel—there is no evidence that the plaintiff was pressed to complete the settlement immediately so as to preclude the procuring of counsel. Moreover, during his hospitalization plaintiff was literally deluged with offers of legal service. He resolved, however, to reject all of these solicitations and to exercise his own judgment in the prosecution of his claim. In this connection it is of relevance that Thompson had previously negotiated releases.

Certainly the defendant was not bound to demand that the plaintiff engage counsel as a condition of entering into a release. The plaintiff independently resolved to forego professional aid. We cannot say that defendant has failed to show an absence of coercion on this score.

It is true that the plaintiff did not have independent medical advice of his choosing. The District Court ruled that had the defendant not told Thompson of Dr. Farr's report and represented it to be correct, a legally different situation would have been presented, for then Thompson presumably would have been free to rely on his own judgment. It must be kept in mind, however, that the Stapleton Hospital, certainly a presumedly neutral party, had predicted a speedier recovery than that forecast by Dr. Farr, the defendant's own physician. Surely a release may be binding without the presence of medical advocates for each side.

The District Court also cited as bases for its decision that the defendant, through its agent Barron, had made false though innocent, misrepresentations of fact and law to the plaintiff. The contention of legal misrepresentation is grounded on the fact that Thompson had been told the success of his case was dependent upon a showing that the defendant had or should have had notice that Medina's presence created a risk of danger to the crew. This statement was urged to be of crucial significance because subsequent to the execution of the release the Second Circuit in Keen v. Overseas Tankship Corp., 1952, 194 F.2d 515, 518, certiorari denied, 1952, 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363, held that the law of unseaworthiness embraced not only a shipowner's warranty as to the physical condition of the ship, but a warranty that the crew is composed of men "equal in disposition and seamanship to the ordinary men in the calling." In fact, the District Court adopted this ruling as the foundation for its decision of liability in the case at bar. We find it wholly unnecessary to express our views on this doctrine or its applicability to

the presented facts. It is sufficient to note that at the time of the execution of the release the courts had never made a declaration that unseaworthiness encompassed a warranty that a crew be composed of men "equal in disposition * * to the ordinary men in the calling."[2] The Keen case, speaking colloquially, cannot be given ex post facto effect for the purpose of making defendant's statement a "misrepresentation".

Similarly, the "misrepresentation" as to Thompson's actual physical condition, being grounded on available and honestly entertained opinion, cannot be made the basis for nullifying this settlement. The premise of all settlements is the unpredictability of future contingencies. The law requires only that there exist a fair and open basis upon which to gauge these contingencies in arriving at a compromise.

Plaintiff urges the relevance of German v. Carnegie-Illinois Steel Corp., 3 Cir., 1948, 169 F.2d 715 in which we struck down a release. There, however, it was clear that economic coercion by the ship owner was of critical importance in motivating the settlement, for although the seaman involved was unable to work for some period of time he was not paid maintenance and cure to which he was indisputably entitled by law. There was no such economic coercion in the instant case. The plaintiff was hospitalized for five of the six months during which he would otherwise have been entitled to maintenance and cure. It is to be noted also that he was given $300.00 for the purpose of making a trip to Hot Springs, Arkansas, for convalescence.

For the reasons stated, the judgment of the District Court will be reversed and the cause remanded with instructions to proceed in accordance with this opinion.

On Petition for Rehearing

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

PER CURIAM.

After due consideration the petition for rehearing in the above-entitled case is hereby denied.

BIGGS, Chief Judge, and McLAUGHLIN, Circuit Judge (dissenting).

We are of the opinion that rehearing before the court en banc should be granted because we think the release executed by Thompson was invalid. As was held by the Supreme Court in Garrett v. Moore-McCormack Co., Inc., 1942, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239, discussed by the court in this case and in German v. Carnegie-Illinois Steel Corp., 3 Cir. 1948, 169 F.2d 715, a seaman's release is not binding if any misrepresentation is made by the shipowner in negotiating the settlement. In this case the negotiator for the shipowner, Barron, told Thompson that Thompson had "a weak case" both as to measure of damages and the law. As a matter of fact Thompson had suffered more serious injury than his, Thompson's, doctor had realized and Barron's statement to Thompson was probably innocent though it worked damage to Thompson's cause. Thompson is a Negro with but slight formal education, who had suffered a se-

---

2. In the Keen case the Second Circuit recognized this to be so. Boudoin v. Lykes Bros., 5 Cir., 1954, 211 F.2d 618, refusing to follow the Keen decision, is not to the contrary, for while the court disagreed that the point was res integra, it did not state that prior decisions had granted recovery on the basis of unseaworthiness but that liability had been *denied* on this basis.

vere head injury and had developed psychoses. D X 2 indicates that about the time he executed the release he was in a confused state of mind. As the opinion of this court reveals, Barron premised his statement that Thompson had a weak case on the law on the asserted conclusion that he could recover from the shipowner only because of the shipowner's negligence and not on the theory that the ship was unseaworthy because of the vicious propensities of the member of the crew who had attacked Thompson.

This was not a correct statement of the law even as it existed at the time the release was executed. While Keen v. Overseas Tankship Corp., 2 Cir., 1952, 194 F.2d 515, was not decided at that time, Judge Learned Hand said in that decision that under prior precedents the question of whether a deficiency in the quality of a crew constituted unseaworthiness was *res integra*.[3] Judge Hand's statement was correct. Quite apart from history and niceties of language, Barron's statement as to the status of the law was incorrect and if he did not know this he should have for no decided case lay against Thompson.

Barron's conduct was subject to the inference, which the court below in effect drew, that he was trying to procure a release from an ignorant and confused seaman on terms most favorable for his client, the shipowner. Barron made use of the sort of language which claim adjustors are accustomed to use when dealing with a claimant with whom they are entitled to negotiate at arm's length. But Thompson was a seaman, a ward of the admiralty, and it is clear, as the District Court found in substance, that he was overreached.

---

3. Cf. Lykes Bros. S. S. Co. v. Boudoin, 5 Cir., 1954, 211 F.2d 618. The Supreme Court in 1955 sustained the Second Circuit view. Mr. Justice Douglas said: "We see no reason to draw a line between the ship and the gear on the one hand and the ship's personnel on the other. * * * A vessel bursting at the seams might well be a safer place than one with a homicidal maniac as a crew member." Boudoin v. Lykes Bros. Steamship Co., 1955, 75 S.Ct. 382, 385.