Christopher McBRIEN, Libelant,

v.

UNITED STATES PETROLEUM CAR-RIER'S INC., a New York corporation as owners, operators, and/or controllers of THE STONY POINT, Respondent.

United States District Court
S. D. New York.

Oct. 15, 1959.

Silas Blake Axtell, New York City, Charles A. Ellis, New York City, of counsel, for libelant.

Kirlin, Campbell & Keating, New York City, James B. Magnor, Thomas R. McLoughlin, New York City, of counsel, for respondent.

FREDERICK van PELT BRYAN, District Judge.

Libelant, a seaman, sues in admiralty for personal injuries sustained aboard the S.S. Stony Point. Respondent is the owner of the vessel.

Libelant claims liability in negligence under the Jones Act, 46 U.S.C.A. § 688, and also that the vessel was unseaworthy. He also seeks maintenance and cure up to the date of the trial and for the future. He claims damages of $100,000 and maintenance and cure to date of $5,320. Respondent pleads a general release as a complete defense to both causes of action. Respondent also denies that it was negligent or that the vessel was unseaworthy and asserts that any injury suffered by the libelant was due solely to his own negligence.

Prior to trial respondent's motion to have the issue of release and payment tried separately was denied. At the trial respondent renewed its motion which I denied. It was plain that much of the proof going to the validity of the release would be relevant on the issues of liability and damages since a seaman's release is only valid if it was executed by the seaman with a full understanding of his rights. Garrett v. Moore-McCormack Co., Inc., 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239. See, also, Thompson v. Coastal Oil Co., 3 Cir., 221 F.2d 559, 562 (on rehearing) (dissenting opinion) reversed 352 U.S. 862, 863, 77 S.Ct. 90, 1 L.Ed.2d 73 (per curiam). See Hume v. McCormack Lines, Inc., 2 Cir., 121 F.2d 336, certiorari denied 314 U.S. 684, 62 S.Ct. 188, 86 L.Ed. 547.

The defense based on the general release is determinative of the action, but I will make full findings on all questions so that there may be a full record in the event of appeal.

The injuries complained of were sustained by libelant in two separate accidents aboard the S.S. Stony Point on April 15 and June 15, 1953. McBrien had signed on as second pumpman on April 9, 1953, at New York for a voyage to the Persian Gulf and the Far East on the Stony Point which is a T–2 tanker. The ship is concededly owned and operated by the respondent.

On April 15, 1953, McBrien was at work in the lower engine room repairing a vacuum trap which was part of a drainage system. The ship had sailed in ballast and she was pitching and rolling. The trap was located some distance above the floor of the engine room at a height which McBrien, a man of average stature, could not conveniently reach. In order to reach the trap McBrien stood on top of a permanently installed suction valve wheel which had a metal rim and spokes. To brace himself he put one foot on a metal bracket which was about two feet away and several inches higher than the wheel. The wheel was about two or three feet in diameter and was about 3 feet above the floor and horizontal to it.

The repair job, which had taken two days, was complete and McBrien was using an open end wrench in tightening the ⅝″ nuts which held the cover of the vacuum trap fast. Standing on the wheel the nuts were about chest high. The ship rolled, the wrench slipped and McBrien fell backward off the wheel, striking his upper back and neck against the metal casing of a thermometer which was attached to an auxiliary water circulator and stood vertically about two feet above the floor. The force of his fall broke the thermometer from its mounting and he landed on the floor on his back.

Libelant charges that the ship was unseaworthy because he was not provided staging on which to stand while working on the vacuum trap and because the vessel did not carry a full and proper complement of tools. He asserts that he fell when the ship rolled because of the precarious stance he was forced to assume, and that he was forced to use an open end wrench which was likely to slip.

The evidence as to these claims was in conflict. Libelant introduced evidence to the effect that the open end wrench he was using was improper for the job and that if a proper box wrench had been available, which it was not, the wrench would not have slipped when the ship rolled and he would not have fallen. Evidence was also adduced that the ship did not carry lumber with which to

construct staging and that this was contrary to safe practice and custom. McBrien testified that he requested that staging be constructed for use in repair of the vacuum trap but that the first assistant engineer McNenomin, who supervised the job, told him the job had to be "done fast" and refused to permit staging to be erected despite McBrien's protests.

Evidence was introduced by the respondent to the effect that the ship carried a full complement of wrenches, that the open end wrench McBrien used was proper for the job; that lumber was available with which to construct staging but that McBrien never requested that staging be constructed and that it was not unsafe to work on the vacuum trap without staging.

■ I accept libelant's testimony that he asked for permission to construct staging but that his request was refused and he was directed to proceed with the job without it.

■ I find that the lack of staging was the cause of McBrien's first accident. The stance which he was forced to take on the suction valve wheel was such that the slipping of a wrench or the rolling of the vessel, or both, could reasonably be expected to cause a fall. It cannot be said that McBrien was at fault. The slipping of a wrench and the rolling of a ship are normal incidents of the sea. It was respondent's responsibility to provide the necessary equipment to minimize such hazards. The evidence is uncontradicted that it is the general custom that staging be utilized on tasks of this nature. It is well settled that a seaman does not assume the risk of an unseaworthy condition when he follows orders over his protest. See, e. g., Holm v. Cities Service Transportation Co., 2 Cir., 60 F.2d 721, and the cases cited therein. See, also, 2 Norris, The Law of Seamen, § 617.

The lack of staging under the circumstances was an unseaworthy condition which was the proximate cause of the accident. It is therefore unnecessary to determine whether or not the ship carried a full complement of wrenches.

After this accident McBrien was on light duty for a few days and then returned to work although he suffered from continuing back pain.

When the ship reached Sasebo, Japan, McBrien was examined in the United States Army Hospital there and X-rays of his back were taken which were negative. No full report of this examination is available but it was recommended that McBrien be kept on light duty.

On June 14, 1953, the Stony Point left Bahrein in the Persian Gulf with a cargo of crude oil bound again for Sasebo, Japan. A routine life boat drill was held the next day on June 15. The weather was rough and the drill was confined to the port side. McBrien's lifeboat station was at the No. 4 which was the aft boat on the port side. His job at the boat was to release the forward gripe. However, due to the weather the Captain ordered that the gripes were not to be released. The drill was to be confined to cranking out the davits and the boat was to remain on the chocks.

As the davits were cranked out the ship took about a five degree roll and a metal band or ring, the function of which is to secure a pelican hook on the gripe which McBrien tended, snapped striking McBrien's right index finger. McBrien fell or was thrown backwards to the deck. His right index finger was severely lacerated and he further injured his back.[1]

Libelant asserts that sheaves located at the end of the davits were frozen due to corrosion and rust and thus did not allow the ropes to pass freely through them. The mechanism is so constructed that, if the ropes do not pass freely through, the effect of cranking out the

1. Although the injury to the finger was severe and there is some residual stiffness libelant's main assertion is that the permanent injury to his back stems from this accident or the one which occurred on April 15, or both.

davits would be to lift the lifeboat from its secure position and to swing it over the ship's side. Thus, as soon as the slack in the ropes was taken up, the lifeboat would be pulled by the davits as they were cranked outboard. In the meantime heavy pull would be exerted on the gripes which are not designed to withstand such pressure.[2]

McBrien testified that when the strain caused by the frozen sheaves put pressure on the gripes he was ordered to secure them and that he was attempting to do so when the ring burst and caused his injuries. There was evidence tending to show that the ring on the pelican hook which broke was corroded.

Respondent's alternative explanation was not convincing. Its theory was that McBrien disobeyed the order not to release the gripe and that when the ring burst he was attempting to do so. Even so, this would be only a partial explanation of the accident. Assuming that the ship rolled there should have been no such unusual strain on the gripes as would cause the pelican ring to burst. I do not believe that McBrien deliberately disobeyed orders as respondent suggests. I accept McBrien's testimony that he was ordered to secure the gripe after an unusual strain had been created by cranking out of the davits due to the frozen sheaves.

 Under the circumstances it appears that the frozen sheaves constituted an unseaworthy condition which was the cause of the accident. I find that McBrien's close proximity to the pelican ring was not in disobedience of orders but in pursuance of his duties.

After this accident the Captain of the vessel stitched the wound. McBrien was put ashore at Colombo, Ceylon, on June 19, 1953, for medical treatment. He was hospitalized there at a nursing home for a month. Besides receiving treatment for his finger he was also treated for pains which he suffered in his upper back, right shoulder and arm.

After discharge from the nursing home at Colombo, McBrien returned to the United States. Immediately upon his arrival in New York he reported to respondent's office and was advised to undergo a physical examination. McBrien then reported to the United States Public Health Hospital at Staten Island where he received outpatient treatment from August 15 until September 22, 1953. On the latter date he became an inpatient and remained at the hospital until January 13, 1954. He complained of pain in his upper back, shoulders and lower back, as well as diminished sensation in his left leg.

Before he entered the Marine Hospital McBrien retained the firm of Miller & Seeger to prosecute any claims which he might have against the respondent. This firm has had wide experience in seamen's personal injury claims.

After his initial discussions with his attorneys McBrien indicated that he was interested in settling his case.[3] One of them, Israel Seeger, had some four conferences with McBrien during May and June 1954. By then McBrien had been found fit for light duty. Seeger advised McBrien against making a settlement. He said that McBrien should sign on for at least one voyage before settling his case, so that the degree and permanence of his injuries could be ascertained more clearly. However, McBrien informed Seeger that he had no intention of returning to sea and insisted that his claim be settled. Seeger then began negotiations with respondent's insurer.

2. The gripes are essentially nothing but chains which are bolted at one end to the deck of the ship and secured at the other end to the lifeboat. When properly adjusted the gripe is taut and holds the lifeboat securely to the chocks. The gripes are released by manipulating a ring which keeps a pelican hook closed.

3. At this time McBrien was receiving maintenance and cure in the sum of $8 per day. The total maintenance and cure he received amounted to $1,325, when he executed the release in June 1954. His attorneys had arranged for the payment of maintenance and cure with respondent's claim agent.

At this time Seeger had available to him abstracts of the Public Health Hospital records concerning McBrien's injury as well as a report by a doctor who examined McBrien on behalf of the respondent. Despite the light duty finding and an apparently favorable prognosis, Seeger acted on the assumption that McBrien was not fit for duty during his negotiations with respondent. After several conferences with the claims department of respondent's insurer terms of settlement were agreed upon.[4]

A lump sum of $10,000 was agreed upon over and above the amount which McBrien had already received by way of maintenance and cure. Thus the total figure was $11,352. Of this figure McBrien received $7,165, which included some wages,[5] in addition to the maintenance and cure paid him.

Seeger fully explained the terms of the settlement to McBrien and McBrien was entirely satisfied with them. The release here in question was then executed and the agreed sum was paid.

The residual effects of McBrien's injury are more severe than anticipated at the time the release was executed. McBrien went to San Francisco in October of 1954. The pains in his back recurred and he gave up his job as a porter and entered the United States Public Health Hospital in San Francisco in January 1954 after receiving outpatient treatment for three months. He remained in that hospital from January 19 to May 4, 1954 and exploratory surgery was performed after traction was ineffective. No disc pathology was found although there was some nerve root pressure. McBrien was fitted with a back brace and discharged for outpatient treatment. The hospital records indicate that the prognosis was good and that "ultimate fitness for full duty" was expected.

McBrien then returned to New York. He claims he was unable to secure work because of his condition and on June 26, 1956, he was referred to St. Vincent's Hospital by the City Welfare Department. On July 4, 1956, he was admitted to the hospital as an inpatient and a few days later another operation was performed through the scar left by the previous surgery. Again no disc pathology was found. However, a quantity of bony overgrowth was found to be exerting pressure on a nerve root. The excess bone was removed and McBrien was discharged on August 7, 1956, as "improved".

At the present time McBrien still suffers from lower back pains. There is some diminution of reflex of his left ankle, which is probably a result of the pressure on the nerve of the bony overgrowth which was removed from his back. His back is straighter than normal. He holds his neck in a fixed midline position. These conditions are the result of the accidents of April 15 and June 14 and are permanent.[6] The ankle and back condition are only slightly incapacitating and the neck disability is classified as "mild to moderate".

Libelant claims that due to his injuries he lost earnings up to the time of trial and will lose earnings in the future.

While McBrien's earning capacities and actual earnings before the accident

---

4. Seeger testified that the insurer was reluctant to settle because McBrien had no witnesses to support his version of the accidents. This is the case and my findings herein are based mainly on McBrien's testimony. Plainly this factor must be taken into account in determining whether the sum for which the claim was settled was fair.

5. The attorney's fee amounted to about $2,800.

6. These findings are based on controverted medical evidence. Both libelant's and respondent's experts indicate in various reports that McBrien's exact physical condition is unclear. This difficulty in reaching definite conclusions is compounded somewhat by differing diagnoses of those who have examined McBrien. Libelant's doctor stated that "This is a difficult and confusing case" and respondent's doctor reported that there was "much confusion in this case".

were not clearly established, it appears that his earning capacity as a second pumpman was in the neighborhood of $7,000 per year.

In the year 1954 McBrien earned only some $300; in 1955 about $1,500; in 1956 about $500; in 1957 about $3,000; and in 1958 about $2,500. His weekly earnings at the times when he has been employed since his accident have ranged between $20 and $78 per week. He has worked on a variety of jobs such as dishwasher, chauffeur, refrigerator maintenance man and YMCA counterman, at which he is presently employed.

It has not been established to my satisfaction that the claimant presently is unable to return to sea, or that he could not have done so considerably prior to the trial. Though he has not attempted to return this seems to be by his own choice. In fact, he told his attorney Seeger at the time of the settlement that he did not intend to go back to sea.

There is no doubt, however, that petitioner was out of work for a considerable period of time as a result of his accident. I estimate that his loss of earnings by reason of the accident and injuries up to the time of trial would amount to approximately $10,000.

His earnings from the time of the accident to date are no index of any permanent diminution of earning capacity. The medical testimony characterized his neck disability as mild to moderate and his pain as slightly incapacitating. His salary potential is diminished only to the extent that it can be reasonably anticipated that he may lose some small amount of work from time to time because of the conditions resulting from his injuries. McBrien is now 44 and has a life expectancy of about 25 years. A fair appraisal of future loss of earnings by reason of his accident on a commuted basis would be no more than $7,500. A fair award for his pain and suffering would amount to $7,500. Thus, absent the defense of release and payment, I hold that the respondent would be liable to libelant by reason of the two accidents which the libelant suffered while employed aboard respondent's vessel in the sum of $25,000.

This brings us to the question of the release which is the controlling question in the case.

The release executed by McBrien is in a form usually utilized in seamen's personal injury cases and is the same as that discussed and held valid in Sitchon v. American Export Lines, 2 Cir., 113 F.2d 830, certiorari denied 311 U.S. 705, 61 S.Ct. 171, 85 L.Ed. 458. In bold red letters the document is headed "Release of all Claims", "Read Carefully", "By signing this you give up every right you have". The operative section, in exchange for the payment of the agreed sum, releases the respondent from liability on account "of each and every right or claim which I now have, or may hereafter have, because of any matter or thing which happened before the signing of this paper; and particularly" the personal injuries suffered by McBrien. Following this, again in bold red type, are the words "This is a release", "I am giving up every right I have". After this the following appears:

"I know that in signing this release I am taking the risk that I may have other injuries from the accident that I do not now know of. I also know that I am taking the risk that the injuries I do know of may be or may turn out to be worse than they seem to me now. I take all these risks. I know I am giving up the right to any further money. I am satisfied.

"I further warrant that the above mentioned sum is received by me in full settlement and satisfaction of all the aforesaid claims and demands whatsoever."

A series of questions then appear which the releasor is required to answer in his own handwriting to the effect that he has read the paper, that he knows its nature and that he understands that his

acceptance ends all claims for damages, maintenance and cure, and wages. The document is signed by the libelant and three witnesses.

As already noted, libelant's attorney Seeger testified, and I accept his testimony, that he explained the effect of signing the release to McBrien. The release was actually executed at Seeger's office and one of the witnesses, a secretary in the office, testified that McBrien signed the paper after reading it and himself writing out the answers to the various questions.

Libelant's attack on the validity of the release which McBrien signed is based on language which appears in Garrett v. Moore-McCormack Co., supra, to the effect that a seaman's release is only valid if executed by a party who has a "full understanding of his rights" [317 U.S. 239, 63 S.Ct. 252].[7] Libelant argues that until the nature and the extent of the injury is clear there can be no full understanding of rights. Libelant misconceives the holding of the Moore-McCormack case and the other cases on which he relies.

In all of the cases which he cites one or more factors were present which do not appear in the instant case. In one the libelant was under peculiar economic duress which was accentuated by his employer's refusal to pay maintenance and cure before the release was executed. German v. Carnegie-Illinois Steel Corp., 3 Cir., 169 F.2d 715. In another the libelant was represented by counsel who was not fully apprised of the facts. Kelcey v. Tankers Co., Inc., 2 Cir., 217 F.2d 541. In a third no independent medical advice was available and the only medical report was that of a doctor in company employ. Chicago & N. W. Ry. Co. v. Curl, 8 Cir., 178 F.2d 497. See, also, Graham v. Atchison, T. & S. F. R., 9 Cir., 176 F.2d 819; Thompson v. Camp, 6 Cir., 163 F.2d 396. In a fourth the employer was alleged to have made false representations. Gifford v. Wichita Falls & S. R. Co., 5 Cir., 211 F.2d 494.

The facts in the instant case are strikingly different. As noted above, libelant had counsel. His attorney specialized in admiralty proceedings of this type. McBrien was examined and hospitalized in the United States Public Health Hospital and his attorney had an abstract of the hospital's findings which did not differ in any substantial respect with the medical report of respondent's doctor which was also furnished here. There were no important facts which were not brought to counsel's attention. McBrien was receiving maintenance and cure and was not under any unusual financial stress. Thus, the main ground upon which libelant relies is that the injury was more serious than originally thought by all the parties.

The libelant received a total of $11,352 in settlement of his claims which I have found represent an ultimate liability of $25,000. This was a substantial sum. This is not a case of a respondent purchasing peace for a pittance. In view of the confusion which even now exists as to the precise nature and extent of the injuries which he sustained, and the possible difficulties of establishing liability on either or both accidents, the settlement was by no means an unreasonable one from McBrien's standpoint.

His counsel advised him to wait until the then somewhat favorable prognosis was established by the passage of time before settling his claim. McBrien's insistence to the contrary was his own decision freely arrived at with full appreciation of the risks.

McBrien testified extensively at the trial. He is quite intelligent and articulate. He was educated in the British Isles and his schooling is roughly equivalent to having gone through high school here. He also has taken technical courses. He was not overreached in any re-

---

7. The Garrett case also held that the burden of proving the validity of a release in a case involving personal injuries to a seaman is on the party who relies on it.

spect and had all of the facts before him as well as the advice of competent counsel. He had in fact "a full understanding of his rights" and for his own reasons chose to take the risk that his injuries might prove more severe and lasting than he then anticipated.

If a release is to be held invalid under these circumstances, it would be virtually impossible to settle seamen's cases without litigation or for a ship owner to purchase his peace at a reasonable and fair figure.

▆ The courts are naturally reluctant to sustain releases where injuries subsequently turn out to be more serious than originally anticipated. This is especially true of courts of admiralty. However, it is well settled that absent any circumstances showing that a seaman had less than a full appreciation of his rights, that he was under economic duress or was overreached in any respect, a release may not be set aside. Here the respondent has sustained its burden of showing that the release was valid and binding and none of the circumstances which would render it invalid have been shown.

One further claim by McBrien can be briefly disposed of. On the stand McBrien told a fantastic tale of alleged harassment and persecution by "insurance investigators" over a period of many months. He claimed that one of the reasons why he settled was to avoid this harassment and persecution.

It is unnecessary to go into the details of this absurd story at any length. It is not only incredible on its face but was affirmatively disproved by testimony adduced by the respondent. Indeed, even were the story to be accepted at its face value, which it plainly could not be, he failed to link these supposed events in any way with the respondent or anyone connected with it.

Counsel for libelant suggests that this may have been a figment of McBrien's imagination and therefore tends to show that his mental condition was not such that he could freely release his claim since he believed himself under duress.

There was no testimony, medical or otherwise, as to the nature of McBrien's illusions, if they were illusions rather than a concocted story. It is true that McBrien mentioned some so-called harassment to his attorney before the release was executed. His attorney very rightly did not take it very seriously, and, in fact, the tale has been considerably embroidered and enlarged by McBrien since that time.

It is plain to me that McBrien settled not because of duress, intimidation or harassment, but because he wanted the money. I reject his testimony as to the alleged persecution and harassment in its entirety and find that it never took place.

In fact, it is plain to me that he believes only a small part of it himself and that this is largely because of not unnatural suspicions of insurance companies, employers and claim agents, but that this was not a significant factor in the settlement which he made. It is of some significance, moreover, that the libelant had educated himself in the law of seamen regarding releases even before the present suit was commenced, and that he was thoroughly familiar with the theories upon which such releases might be set aside.

▆ I therefore find that the respondent has sustained its burden of showing that the release was "fairly made with and fully comprehended by the seaman". Harmon v. United States, 5 Cir., 59 F.2d 372, 373; Law v. United Fruit Co., 2 Cir., 264 F.2d 498. I find the release executed by the libelant to be valid and binding upon him and that the payment called for by the release was made to the libelant in full. The release is therefore a complete defense to the libelant's claims and judgment must be entered for the respondent.

Judgment will be entered accordingly.