**OFFSHORE LOGISTICS, INC.**

v.

**ASTRO–MARINE, INC.**

Civ. A. No. 78–2822.

United States District Court,
E. D. Louisiana.

Jan. 15, 1980.

CHARLES SCHWARTZ, Jr., District Judge.

This matter came on for non-jury trial on a former day. At the close of evidence the Court took the matter under submission for further consideration. Now, after careful review of the record in this matter, the evidence adduced at trial, the memoranda of counsel, and the applicable law, the Court rules as follows:

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

On or about December 28, 1977, plaintiff Offshore Logistics, Inc. was the owner and operator of the M/V MONARCH and the M/V RELIANCE which, along with the M/V POLARIS, which was owned and operated by defendant Astro Marine, Inc., were secured to a pier in Bushehr, Iran. The M/V MONARCH was moored outboard the M/V RELIANCE which in turn was moored outboard of the M/V POLARIS which was tied to the pier. Eugene Stokes was employed by plaintiff as Master of the M/V MONARCH. Eduardo Espina was employed by defendant as Master of the M/V POLARIS.

At approximately 0100 hours on December 28, 1977, Captain Stokes was sitting in the galley of the M/V MONARCH along with John Levesque, Port Superintendent of the M/V MONARCH, Roger Melton, a mate, the Chief Engineer of the M/V RELIANCE, and a crewman named "Pat." A deckhand, Romeo Napilon, walked into the galley on his way to his cabin with a bottle of wine. Captain Stokes had a policy against allowing alcohol aboard his vessel and confiscated same to the extent of taking it from the possession of the seaman, and placing it on a counter top in the galley. Where or from whom Napilon acquired the wine is unknown. Not long thereafter Captain Espina of the M/V POLARIS and a deckhand from the M/V RELIANCE, named Aries, entered the galley and demanded return of the bottle of wine. Captain Stokes refused to comply with such demand. However, he also made no attempt to ascertain who was the owner of the wine or if Captain Espina and Aries had given it to Romeo Napilon. When Captain Espina spied the bottle of wine on the counter top and began to move in its general direction, Captain Stokes blocked his path, took his arm and attempted to escort him to the door of the galley. Thereafter an altercation ensued during which blows were exchanged between Captain Espina, Captain Stokes and Aries. The altercation lasted approximately thirty to forty-five seconds, after which period of time Levesque and Melton intervened and separated the combatants and persuaded Captain Espina and Aries to leave the galley. Captain Espina and Aries left the galley but continued to

shout threats against Stokes for a period of time before finally leaving the vessel. Captain Stokes claimed that Captain Espina struck the first blow; however Melton, the only other witness who testified, was not certain who struck the first blow.

Captain Stokes was an American, and Captain Espina, Aries, and Romeo Napilon were Philippinos. It is apparent that Stokes harbored animosity towards Philippinos (Depo. p. 68; 70–71).

Some time after the fight, Captain Stokes alleges he felt dizzy and had a slight "tilt" in his vision and noticed pain and tenderness in his shoulders and rib cage. He stated the dizziness would come and go and black spots would affect his vision. He was seen in the American Missionary Hospital in Bahrain on January 8, 1978, complaining of vertigo. Thereafter he was repatriated to the United States for further medical study and was examined by Dr. H. Hooshmand in Florida (near his home) who conducted a neurological examination on January 12, 1978. This examination was essentially negative and Dr. Hooshmand felt Captain Stokes had sustained a mild head injury with minimal post-traumatic nystagmus. Captain Stokes remained on medical leave for approximately ninety days, that is from December 28, 1977 until April 18, 1978, during which period of time he received full pay from plaintiff. Thereafter Captain Stokes returned to Bahrain where he resumed his former position and worked for approximately 54 days, after which time he again complained of feeling ill. He was repatriated to the United States and was treated by Dr. M. Faroog of Sebastian, Florida, who found an abnormality in Stokes' blood. Captain Stokes was under this doctor's care from June 13, 1978 until August 8, 1978, after which he was found to be fit to return to work and has been continuously employed by plaintiff on a regular basis.

The parties stipulated that plaintiff expended on behalf of Stokes: (a) medical expenses in the sum of $2,544.29; (b) air fare of $1,574.36 for returning Stokes to the United States for medical treatment on the two occasions mentioned above; (c) full wages amounting to $10,080.00 during the time he was not working.

Plaintiff thus seeks to recover the sum of $14,198.65 from defendant based upon Captain Espina's actions, claiming that his alleged misconduct is attributable to his employer, Astro-Marine, Inc.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this admiralty matter and venue is proper in the Eastern District of Louisiana.

 An employer may be found liable for an assault by an employee under the doctrine of *respondeat superior* provided it bears: (1) a relation to the real or apparent scope of his employment; or (2) to the interests of his employer. *City of Green Cove Springs v. Donaldson*, 348 F.2d 197 (5th Cir. 1965). Further, under appropriate circumstances, an employer who knows, and/or can foresee, that an employee is likely, while on the job, to commit an assault may likewise be held responsible for such employee's activities. However, in order to sustain liability for such negligence, there must be a showing that the assailant is a person of known vicious character, or one who the employer should have known was a vicious character. *Schultz v. Evelyn Jewell, Inc.*, 476 F.2d 630 (5th Cir., 1973).

 The facts in this case demonstrate that Captain Espina's action had nothing whatsoever to do with his employment or the interest of his employer. It appears that he was simply trying to take the part of his fellow National against a captain who apparently bore some ill will towards Philippinos, or at the very least was intolerant or had a lack of regard for them. Although Captain Stokes claimed Captain Espina to be drunk at the time of the incident, there is no evidence whatsoever that he was a known drunkard, nor was there any evidence that he was a person of known vicious character so as to justify an inference of negligence on the part of defendant in keeping Captain Espina in its employ.

In the instant case defendant as owner of the M/V POLARIS owed no warranty of seaworthiness to Captain Stokes, the master of plaintiff's vessel, the M/V MONARCH. However, even in those cases where a vessel has been found to be unseaworthy, for assaults committed by its crew there must be a known predisposed reputation for a proclivity for assault, drunkenness, quarrelsome nature, use of a dangerous weapon, or other factors. *Boudoin v. Lykes Bros. S.S. Co., Inc.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); *Walters v. Moore-McCormack Lines, Inc.*, 309 F.2d 191 (2nd Cir., 1962); *Thompson v. Coastal Oil*, 119 F.Supp. 838 (D.N.J.1954), rev'd on other grounds, 221 F.2d 559 (3rd Cir., 1955); *Handley v. United States*, 157 F.Supp. 616 (S.D.N.Y., 1958).

Reduced to its simplest terms, we have in the instant case a fistic brawl over a bottle of wine against a background of some racial or nationalistic antagonisms. To impose liability under such circumstances would require us to ignore what Judge Learned Hand said in *Jones v. Lykes Bros. S.S. Co.*, 204 F.2d 815 (2nd Cir. 1953), "Sailors lead a rough life and are more apt to use their fists than office employees."[1] Plaintiff thus seeks to have this Court ignore all reasonable bounds in assessing negligence of an employer under *respondeat superior*, and in its stead create a new doctrine that an employer of seamen is the guarantor of the good behavior of its seamen, and strictly liable for the damage caused by every kind of their tortious misconduct. This we decline to do.

Accordingly, there should be judgment in favor of defendant, dismissing plaintiff's claim at its cost, and the Clerk of Court is instructed to enter judgment in accordance herewith.

---

1. One cannot help but to conclude that if Captain Stokes had been of a more passive nature, he would not have initially grabbed Captain Espina by the arm, but instead would have inquired if the wine had been a gift to Napilon from Captain Espina and/or Aries and offered to return it to them provided they removed it from his vessel.