Floyd Wesley CLEVENGER, Appellant,

v.

STAR FISH & OYSTER COMPANY, Inc.,
Appellee.

No. 20232.

United States Court of Appeals
Fifth Circuit.

Dec. 6, 1963.

398

Edgar N. Quillin, Arabi, La., Maury Friedlander, Mobile, Ala., for appellant.

Thomas M. Galloway, Mobile, Ala., for appellee, Collins, Galloway & Murphy, Mobile, Ala., of counsel.

Before CAMERON, WISDOM and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

Floyd Clevenger, the libellant, was a fisherman and deck hand on the Star Queen, a small fishing vessel owned by the respondent, the Star Fish & Oyster Company, Inc. On the evening of July 14, 1961, after a three weeks voyage, the Star Queen put into its home port, Mobile, Alabama, and docked at the Star Fish dock. The following morning Clevenger, who had gone ashore the night before, returned to the ship about nine o'clock to help unload the catch. The unloading had started about two hours earlier. The Captain of the ship was not present, and John Whitaker, the first mate, was in charge. Whitaker was in the hold loading fish into tubs which were raised by machinery to the deck. Clevenger was on the deck near the hatch. His duty was to unload the tubs onto the dock and return the empty tubs to the hold. According to the trial judge's finding, a delay occurred because of trouble with the lifting machinery. Whitaker and Clevenger exchanged seamen's unpleasantries. Then, without word or warning, Whitaker climbed a ladder to the deck at a time when Clevenger was facing the other way and drove a "devil's fork" deep into Clevenger's back. A devil's fork is an ice chisel. This one was a steel bar, one inch thick, four feet long, ground to a sharp point at one end. It severed two of Clevenger's ribs and punctured a lung. He pitched head forward down the hold onto iced fish eight feet below.

Clevenger brought this libel in admiralty against the shipowner, Star Fish & Oyster Company, Inc., alleging the unseaworthiness of the ship and the shipowner's negligence under the Jones Act, 41 Stat. 1007 (1920), 46 U.S.C.A. § 688, and asking for maintenance and cure. The district judge held that the libellant had not sustained the burden of proving negligence or unseaworthiness, and denied recovery for maintenance and cure. In his findings and conclusions as to unseaworthiness the district judge stated:

"The fishing excursion had been concluded insofar as the catching of fish was concerned. * * * [I]nsofar as fishing operations are concerned, the members of the crew, including Captain Holst and including the first mate, Whitaker, were members of a joint enterprise. * * * I find that what was being done at the Port of Mobile, in connection with the unloading of the fish, and all that occurred at the time on the morning of July 15th, 1961, was work in connection with the unloading of the fish, and was not connected with the duties of any members of the crew in connection with seamanship, so far as navigation and operation of the vessel are concerned. * * * Because of the finding heretofore made, the Court finds that nothing that was done at the time when Libelant was struck by Whitaker had any connection with a furtherance of the work of the vessel from the standpoint of navigation or operation of the vessel, but, on the other hand, such work that did occur in connection with the unloading of the fish on the date in question were operations in connection with the unloading of the fish and all duties and all work done by all members of the crew at that time were operations not in furtherance of the duties of the vessel only from the seamanship standpoint, but they were duties performed by the individual members of the crew as joint venturers. * * * Libelee did not have imposed upon it a duty to inquire into the type of men engaged by Holst, the captain, to make up the crew. There was a duty on Holst's part, as an employee of the Libelee, to use reasonable care and caution in the employment of individuals to

make up the crew. \* \* \* I hold that the duty to use reasonable care and caution by an employee of the owner of the vessel to select a crew to go on a fishing excursion was performed in this case, and I find that the Libelant has failed in regard to showing negligence in this regard. \* \* \* There is no evidence in this case that this vessel was not seaworthy as such. I have given full consideration to the aspect of seaworthiness, as to the duty of the vessel, through its agents, servants or employees, in the selection of a crew, to use care and caution of a reasonable nature, and I have held and do now re-affirm that holding that in this regard the Libelee is not shown to have been derelict in this duty. \* \* \* The duties incident to the seamanship are distinguished from a fishing operation. \* \* \* So, the distinction, as I am commenting upon in these remarks, is that the injury suffered by Plaisance [who was injured by a defective winch, Southern Shell Fish Co. v. Plaisance, 5 Cir. 1952, 196 F.2d 312] was on account of the seaworthiness of the vessel, and not in regard to an unloading operation of the fish, which I have held was distinctly a part of the fishing operation and not of the navigation of the vessel."

We reverse. The district judge applied erroneous criteria in determining seaworthiness. A seaman such as Whitaker, who may be properly characterized as "defective", because he fails to measure up to the standards of his calling, renders a ship as unseaworthy as a defective winch. Whether Clevenger is regarded as a seaman or a joint venturer on a fishing enterprise, the injury to him which took place while he was unloading the ship comes within the long, protective arms of Sieracki. Sea Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

The warranty of seaworthiness extending from the shipowner has its roots deep in maritime history.[1] Dixon v. The Cyrus, D.Penn. 1789, 7 Fed.Cas. 755 (No. 3,930). But "until the 1940s the seaman's right to recover damages for injuries caused by unseaworthiness of the ship was an obscure and little used remedy."[2] What was originally a justification for sailors' abandoning a ship before the expiration of its tour slowly emerged as a means of recovering for injuries resulting from the operating negligence of the shipowner. Mr. Justice Brown's famous dictum in The Osceola, 1903, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760, 764, that the shipowner is liable to seamen for unseaworthiness, "a failure to supply and keep in order the proper appliances appurtenant to the ship", became law in Carlisle Packing Co. v. Sandanger, 1922, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927. And Carlisle gave a glimmering of things to come.

The notion of liability without fault for unseaworthiness, only hinted at in Carlisle, reappeared full-blown twenty-two years later, in Mahnich v. Southern Steamship Co., 1944, 321 U.S. 96, 64 S. Ct. 455, 88 L.Ed. 561, in which the Supreme Court held, in effect, that unseaworthiness included "operating negligence". Not long after Mahnich, the Supreme Court, in Sieracki, held a shipowner liable without fault to a stevedore injured while aboard the ship: "Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor con-

1. For the history of the development of the doctrine, see Mitchell v. Trawler Racer, 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; Tetrealt, Seaman, Seaworthiness, and the Rights of Harbor Workers, 39 Cornell L.Q. 381 (1954); Benbow, Seaworthiness and Seamen, 9 U.Miami L.Rev. 418 (1955); Gilmore and Black, The Law of Admiralty, 315–332 (1957); Baer, Admiralty Law of the Supreme Court, 12–30 (1963); Norris, Maritime Personal Injuries § 27–48 (1959).

2. Gilmore and Black, The Law of Admiralty, p. 315 (1957).

tractual in character. * * * It is a form of absolute duty owing to all within the range of its humanitarian policy." This duty is non-delegable and pertains to latent as well as patent defects; neither ignorance nor due diligence will serve as an adequate defense. Thus liability attaches when a vessel, otherwise seaworthy, on her return to port is rendered temporarily unseaworthy during the unloading process. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941. That important decision in the area of transitory unseaworthiness is consistent with Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, where the Court affirmed a judgment against the shipowner for liability for injuries caused by defective equipment temporarily brought on board by an independent contractor. In short, although a shipowner, as the Court said in Morales v. City of Galveston, 1962, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412, is not an insurer as to all accidents which occur on his ship, he warrants a safe vessel to all persons, including longshoremen and employees of an independent contractor, exposed to the hazards of performing a seaman's service. See also Guitierrez v. Waterman SS Corp., 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297.

██ Early cases on seaworthiness established that a "defective" crew renders a vessel unseaworthy as readily as defective equipment or a leaky ship. See McLanahan v. Universal Ins. Co., 1828, 1 Pet. 170, 7 L.Ed. 98; Brown v. The D.S. Cage, E.D.Tex., 1872, 4 Fed.Cas. 367 (No. 2,002); Re Pacific Mail S.S. Co., 9 Cir. 1904, 130 F. 76. This principle extends to unseaworthiness caused by the presence of a vicious and unreasonably belligerent seaman (The Rolph, 9 Cir. 1924, 299 F. 52, cert. den'd, 266 U.S. 614, 45 S. Ct. 96, 69 L.Ed. 468) and applies even when the owners of the vessel have no knowledge of a seaman's dangerous propensities. Keen v. Overseas Tankship Corp., 2 Cir. 1952, 194 F.2d 515, cert. den'd, 343 U.S. 966, 72 S.Ct. 1061, 96 L. Ed. 1363. In Keen one seaman attacked

another with a meat cleaver. The district judge instructed the jury that the shipowner was not liable unless he knew or should have known of the attacker's vicious character. The Second Circuit reversed and remanded the case. Judge Hand, for the Court, found that liability for personnel was identical with liability for hull and gear. The warranty of seaworthiness, however, is not one of absolute insurance:

"The warranty of seaworthiness as to hull and gear has never meant that the ship shall withstand every violence of wind and weather; all it means is that she shall be reasonably fit for the voyage in question. Applied to seamen, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling." 194 F.2d at 518.

But in the light of *Mahnich*, the duty is absolute, nondelegable, and not conditioned on fault or notice.

In Jones v. Lykes Bros. S.S. Co., Inc., 2 Cir. 1953, 204 F.2d 817, a crew member gave the libellant a bad beating, continuing his blows even after the libellant had fallen. The assailant was not known to have a violent nature and used only his fists. The Court reaffirmed the *Keen* test although it reversed the finding of unseaworthiness. Judge Hand pointed out: "All men are to some degree irascible * * *. Sailors lead a rough life and are more apt to use their fists than office employees". On the facts, there was nothing to show that the assailant was not "equal in disposition and seamanship to the ordinary men in the calling".

In Boudoin v. Lykes Bros. S.S. Co., Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, the Supreme Court accepted the theory of unseaworthiness based on personnel falling below the standards of the calling. Boudoin's injury was inflicted by a deck maintenance man named Gonzales who entered Boudoin's cabin during a nighttime drinking party in search of a bottle of brandy. Boudoin awoke and

startled Gonzales who attacked him savagely with the brandy bottle, inflicting grave injuries. The district court found that Gonzales was "a person of dangerous propensities and proclivities", "a person of violent character, belligerent disposition, excessive drinking habits, disposed to fighting and making threats and assaults". Boudoin v. Lykes Bros. S.S. Co., Inc., E.D.La.1953, 112 F.Supp. 177 at 179. Justice Douglas said:

> "We see no reason to draw a line between the ship and the gear on the one hand and the ship's personnel on the other. A seaman with a proclivity for assaulting people may, indeed, be a more deadly risk than a rope with a weak strand or a hull with a latent defect. The problem, as with many aspects of the law, is one of degree. Was the assault within the usual and customary standards of the calling? Or is it a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature? If it is the former, it is one of the risks of the sea that every crew takes. If the seaman has a savage and vicious nature, then the ship becomes a perilous place. A vessel bursting at the seams might well be a safer place than one with a homicidal maniac as a crew member." 348 U.S. 336, 339, 75 S.Ct. 382, 384, 99 L.Ed. 354.

A number of cases have applied the *Keen* test as restated in *Boudoin*. In Kelcey v. Tankers Co., 2 Cir. 1954, 217 F.2d 541, the libellant was attacked by the second cook. The attacker was a much more powerful man, had served a sentence for an attack with a deadly weapon while in the Navy, and had previously threatened men aboard ship with a knife and with an axe. The Court affirmed the finding of unseaworthiness. In Connolly v. Farrell Lines, Inc., 1 Cir. 1959, 268 F.2d 653, however, the Court sustained the trial judge's directed verdict for the shipowner where the plaintiff was injured as a result of an attack by a fellow crew member wielding a three foot plank. But the plaintiff had at hand

the neck of a broken bottle. The shipowner is not liable, said the court, for "injuries resulting from every sailor's brawl. * * * This was not a premeditated attack with an unmistakably deadly weapon such as a meat cleaver". In Walters v. Moore-McCormack Lines, Inc., 2 Cir. 1962, 309 F.2d 191, the court, over a vigorous dissent by Judge Friendly, concluded that an attack by one seaman upon another did not justify the submission of the question of seaworthiness to a jury.

> "In those assault cases where the issue of unseaworthiness has been held properly submissable to a jury, *the hallmark has been either an assault with a dangerous weapon* or independent evidence of the assailant's exceptionally quarrelsome nature, his habitual drunkenness, his severe personality disorder, or other similar factors." (Emphasis added.) 309 F.2d at 193.

The attacker used only his fists and there was no evidence of earlier trouble. In Thompson v. Coastal Oil Co., N.J.1954, 119 F.Supp. 838, rev'd on other grounds, 3 Cir. 1955, 221 F.2d 559, the libellant accused an effeminate messman of being a homosexual. The messman hid in a doorway and struck the libellant three times over the head with a meat cleaver. The district court, sitting without a jury, found that the presence of the messman rendered the vessel unseaworthy. Similarly, the fact that a ship's crew included a belligerent man who would stab a fellow crew member with a pocket knife rendered the ship unseaworthy in Handley v. United States, S.D.N.Y.1958, 157 F.Supp. 616.

The doctrine that a seaman's attack is a breach of the warranty of seaworthiness applies to an unprovoked attack by a longshoreman on a fellow longshoreman. A longshoreman's use of two cargo hooks was seen as sufficiently vicious to allow a jury to consider the question of seaworthiness. Smith v. Lauritzen, E.D.Penn.1962, 201 F.Supp. 663.

■ In all of these cases, as Mr. Justice Douglas put it in *Boudoin*, the question is: "Was the assault within the usual and customary standards of the calling". We extract from the cases the principle that in itself a savage assault with a meat cleaver or similarly dangerous weapon can be sufficient proof that the attacker is "not equal in disposition and seamanship to the ordinary men in the calling". Drunkenness and bellicosity are additional factors to consider when the nature of the assault is inconclusive evidence of the attacker's fitness in terms of his calling.

■■ Ordinarily the issue is a question of fact to be determined by the trier of fact. Here, the assailant was in command at the time of the incident. He attacked stealthily, savagely. A "devil's fork" plunged into a man's back is a deadly weapon. In these circumstances, we hold, as a matter of law, that Whitaker's attack on Clevenger was a breach of the warranty of seaworthiness. His presence on the Star Queen was a peril to the ship. No place on the ship near Whitaker was a safe place for a seaman to work. Whether the master used due care in the selection of a crew may have a bearing on negligence, but not on the shipowner's duty to furnish a seaworthy ship. In determining seaworthiness, the district court erred, therefore, in attaching importance to the respondent's "care and caution of a reasonable nature" in "the selection of a crew".

■ The trial court found in effect that Clevenger was not a seaman, after the vessel reached port; that "as to the operations of the ship in connection with the actual fishing operations, as well as the disposal of the fish after they reached the port and there being unloaded. * * * [all] were members of a joint venture". We think that Clevenger did not lose his status as a seaman. But in any event, he was a seaman's substitute in unloading fish at the time of the attack. In *Sieracki* the injured libellant was a longshoreman, employed by an independent contractor. In Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, a carpenter, employed by an independent contractor to repair grain loading equipment, fell through an uncovered hatch on a ship. The Court, following *Sieracki*, saw carpentry among the traditional responsibilities of seamen and allowed recovery against the shipowner. Sieracki, Hawn, and Clevenger, while doing a seaman's work, were exposed to the hazards of an unseaworthy ship. The shipowner owed them the absolute duty of furnishing a safe ship.

■ There is no evidence that Clevenger was converted from a seaman to a joint venturer on the return of the Star Queen to Mobile, Alabama, except that the officers and crew were paid in shares. This fact alone does not establish a joint venture. Osland v. Star Fish & Oyster Co., 5 Cir. 1939, 107 F.2d 113; 118 F.2d 772. And in this case its significance has a bearing only on the question whether there is an employer-employee relationship under the Jones Act. For recovery on the warranty of seaworthiness, it is not significant that conceding Clevenger was a joint venturer, the breach of warranty might be said to have been that of the joint venture. Unseaworthiness may arise from the acts of an injured longshoreman himself employed by an independent contractor. See Grillea v. United States, 2 Cir. 1956, 232 F.2d 919; Alaska S.S. Co. v. Petterson. Here, there is no contention, no suggestion that the owner surrendered control by a demise charter or that the effect of a joint venture is to transfer control and responsibility from the shipowner to the joint venturers. See Guzman v. Pichinilo, 1962, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed. 2d 205; Vitozi v. Balboa Shipping Co., 1 Cir. 1947, 163 F.2d 286.

When the action for unseaworthiness is available, its notion of liability swallows up any notion of maritime negligence, no matter how leniently conceived. We see no need, therefore, to discuss negligence.

We affirm the district court's holding on maintenance and cure. The United

States Public Health Service gave the libellant treatments, and there is no evidence that the libellant paid any expenses while he was disabled.

We reverse with instructions that the district court determine the amount of the damages and enter a judgment for the libellant.

CAMERON, Circuit Judge, concurs in the result.