**Leon A. RAINVILLE, Plaintiff,**

v.

**F/V "GEM", her engines, etc., Defendant.**
**Civ. No. 72–217.**

United States District Court,
S. D. Florida,
Miami Division.

June 30, 1972.

Arthur Roth, Miami, Fla., for plaintiff.

Reginald M. Hayden, Jr., Miami, Fla., for claimant-owner.

## MEMORANDUM OPINION

ATKINS, District Judge.

This cause, in which plaintiff seeks damages for breach of the warranty of seaworthiness and maintenance and cure under the general maritime law for injuries suffered in an altercation after the completion of a fishing voyage, came before the Court for a non jury trial on the issue of liability. The Court, by its order of June 5, 1972, has already dismissed plaintiff's Jones Act claim without prejudice. Plaintiff has properly invoked the admiralty jurisdiction of this court. The testimony at trial, largely uncontradictory, disclosed the following facts.

Defendant-claimant owner, Captain James D. Helms, Sr. is the owner and master of a forty foot commercial fishing vessel called the "M/V Gem." Aboard the Gem, fishing is done with ordinary fishing tackle, wielded by a standard crew of three plus the captain. Captain Helms ordinarily recruits his three companions from among those who inquire about employment at his boat. He testified that the wage arrangement was that known as "shares." Each crew member, upon completion of a trip, receives the amount of money which his catch is worth at the fishery less his share of the expenses of the voyage, after division of the spoils. It is the captain's practice, after completion of a voyage, to tell those members of the crew whose performance was satisfactory to check at the vessel each morning about 8 or 9 o'clock to see if the weather and fishing conditions are favorable for

the next voyage, if they desire to fish again.

Captain Helms testified that his crew was usually inexperienced. A large turnover could be expected, for the remuneration involved was often small. (The plaintiff's "share" for his ten day trip came to only $6.80.) Located near the dock on the Miami River, the Salvation Army lodgings produced many crew members. On the trip in question, the Captain asked Steve Snead to round up men for him, to replace two fishermen who had secured new employment after the Gem's last voyage. Snead was a "regular" crew member who lived on board as a watchman when the vessel was in port.

On this occasion, near Thanksgiving of 1971, Snead went to the Salvation Army and recruited the plaintiff and one Charles Coram, later to become the assailant, for the next voyage. Plaintiff, who had no fishing experience although he was a longtime maritime union member, expressed a willingness to make the trip. He discussed the "shares" with the Captain, then carried some clothes and necessities to the vessel, and stayed on board until the weather cleared for the voyage. I find that plaintiff lived on the vessel for several days prior to departure with the implied, if not express, consent of the Captain, who dropped in daily to check on the ship and the weather.

When the trip finally began the three crew members shared the same cabin. They had no assigned duties other than their fishing, but all helped out with bait preparation and weighing anchor. After approximately ten days in the Bahamas, the vessel returned to the dock the morning of December 6, 1971. Captain Helms weighed each man's catch, calculated the shares, and paid off the crew. The Captain told the crew that if they wanted to make another trip with him they should check at the boat between 8 and 9 o'clock each morning. At that time, plaintiff indicated his desire to make the next trip.

Captain Helms testified that there was no further conversation, but that if plaintiff had asked for permission to remain on board, he would not have objected. In the past, some men had stayed aboard during the layover, but they were not paid and had no duties at the time. Snead was asked to remain on the vessel as a watchman.

I find that plaintiff chose to remain on the Gem with the implied, but not express, consent of Captain Helms. Plaintiff left the boat and returned about 3:00 p.m. From 4:00 o'clock until about 6:30, when Coram returned to the vessel, the plaintiff and Snead shared a small quantity of liquor. Coram later became belligerent as they sat in the cabin and threatened Snead with a "long bread knife." He then turned on plaintiff, who sustained a gash on the back of his head and injuries to his right hand when he reached for the knife to protect himself. Plaintiff escaped to a neighboring boat, where he hid until the police arrived, at about 9:00 p.m.

The attack on plaintiff was unprovoked. It is clear that Coram was the aggressor and that plaintiff was in no way at fault.

Plaintiff claims first that defendant breached the warranty of seaworthiness in that the shipowner failed "to provide men equal in disposition to the ordinary man of the calling." Boudoin v. Lykes Brothers Steamship Co., 348 U.S. 336, 337, 75 S.Ct. 382, 99 L.Ed. 354 (1955). While the owner is not to be held liable for injuries sustained in every brawl, "the presence of 'a seaman with a wicked disposition, a propensity to evil conduct, [and] a savage and vicious nature' renders the vessel unseaworthy." Robinson v. S. S. Atlantic Starling, 369 F.2d 69 (5th Cir. 1966), cert. denied, 386 U.S. 993, 87 S.Ct. 1309, 18 L.Ed.2d 339 (1967).

Captain Helms suggests that I should adopt the less onerous unseaworthiness doctrine applicable in the Second Circuit, where some proof of "prior vicious conduct" is apparently necessary to create liability. See, e.g. Gerald v. United

States Lines Co., 368 F.2d 343, 345 (2d Cir. 1966). There is, however, no suggestion of such a requirement in *Boudoin, supra,* where no evidence of prior knowledge of the assailant's savage disposition was adduced. Similarly, the Fifth Circuit cases dealing with assaults by crew members have not imposed this limitation. *See, e. g.,* Clevenger v. Star Fish & Oyster Co., 325 F.2d 397 (5th Cir. 1963).

■ On the facts before the Court, it appears that plaintiff would be entitled to recover for breach of the warranty of seaworthiness if plaintiff was within that class of persons to whom said warranty is extended. It is this obstacle that plaintiff's unseaworthiness claim, like his claim for maintenance and cure, cannot surmount.

The plaintiff and Charles Coram are apparently similarly situated. Of course, neither had "signed on" for the trip, since there were no formal ship's articles. It had been their first trip. Neither had secured permission to remain on board, and the Captain, as his past experience indicated, had no assurance that either would be on the ship when it next sailed. In fact there was no fixed date for the next voyage. Both plaintiff and Coram had been paid off in full. They had no further duties to perform on or for the ship, and they naturally would receive no additional compensation. In fact, Mr. Snead had been asked to guard the vessel while in port. Captain Helms testified that the only food on board on December 6, 1971 was some remaining staples. No food was provided while the vessel was in port, and even Snead who was asked to remain aboard, ate ashore.

The concept of a "seaman" for Jones Act, unseaworthiness, and maintenance and cure purposes is very much the same. Who is a Jones Act "seaman" is governed by the same tests that control who is a "member of a crew of any vessel" under the Longshoremen's and Har-

bor Workers' Compensation Act, 33 U.S. C. § 903. Hardaway Contracting Co. v. O'Keeffe, 414 F.2d 657, 659 (5th Cir. 1968); Noble Drilling Corp. v. Smith, 412 F.2d 952, 956 (5th Cir.), cert. denied, 396 U.S. 906, 90 S.Ct. 221, 24 L.Ed.2d 182 (1969).

■ Seaman status in each case depends upon the facts of the particular case. Desper v. Starved Rock Ferry Co., 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205 (1952). An analysis of the duties performed for the employer in aid of the ship is crucial to the determination. *See, e.g.,* Braen v. Pfeifer Oil Transportation Co., 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191 (1959); Robichaux v. Kerr McGee Oil Industries, Inc., 317 F.Supp. 587 (W.D.La.1970). Here neither plaintiff nor Coram had any duties. They were not, in the words of the court in *Desper, supra,* 342 U.S. at 191, "seamen in being," if indeed they were even "probable or expectant seamen."

This case is perhaps most similar to Union Oil Co. v. Pillsbury, 63 F.2d 925 (9th Cir. 1933). That court held that a seaman, who had been paid off after the vessel's return to port for a brief overhaul, but who remained on board as a night watchman and was shot during a burglary, was not a member of the vessel's crew for purposes of the Longshoremen's and Harbor Workers' Compensation Act. "Even though he was permitted to occupy the quarters which he has used while he was an officer, his employment as such had ended." *Id.* This suggests that even Snead, who remained on board at the owner's request, was not a "seaman" at the time of plaintiff's injury. It certainly follows that plaintiff and Coram were not.[1]

■ The original unseaworthiness doctrine was that owners owed to the seamen "the duty of furnishing a seaworthy vessel and safe and proper appliances in good order and condition." 2 Norris, The Law of Seamen § 612 (3rd ed. 1970). The protection of this abso-

---

1. The Jones Act applies only to a "seaman" injured "in the course of his employment." Thus plaintiff's Jones Act claim, if it could have been maintained solely against the vessel *in rem,* would have failed as well.

lute duty has been extended to longshoremen and to those harbor-based workers who come aboard the ship to perform duties traditionally handled by the ship's crew. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Clevenger v. Star Fish & Oyster Co., 325 F.2d 397 (5th Cir. 1963). It has not, however, been extended to invitees, licensees or other persons on board who are not "doing a seaman's work and incurring a seaman's hazards." Seas Shipping Co. v. Sieracki, supra, 328 U.S. at 99, 66 S.Ct. at 880. Accord, Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 629, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). This expansive and often expensive warranty has only been extended to "persons, including longshoremen and employees of an independent contractor, exposed to the hazards of performing a seaman's service." Clevenger v. Star Fish & Oyster Co., supra, 325 F.2d at 400. Plaintiff in the case sub judice was neither a seaman nor a seaman's substitute at the time of his injury. Accordingly, the absolute warranty of a safe ship was not extended to him at that time.[2] Cf. Stewart v. Steamer Blue Trader, 428 F.2d 361 (1st Cir. 1970) (no warranty to a licensee-guest of crew member.)

Plaintiff also seeks an award of maintenance and cure, a form of compensation extended under the general maritime law to seamen injured while in the service of the ship. Central Gulf Steamship Corp. v. Sambula, 405 F.2d 291 (5th Cir. 1968). Typically these claims arise from beatings incurred while on shore leave, as in the Sambula case, supra. The rationale for recovery is that the injured crew member was in the service of the ship since his relaxation should increase his subsequent efficiency and thus benefit the ship and its owner.

Such a rationale is obviously inapplicable here where plaintiff, who was not a "seaman" at the time of injury, remained on the ship for his own convenience to save the cost of dryland lodging. He was not in any sense "serving any direct or indirect interest of his [former] employer." Sellers v. Dixilyn Corporation, 433 F.2d 446, 449 (5th Cir. 1970), cert. denied 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 332 (1971).

As noted in Baker v. Ocean Systems, Inc., 454 F.2d 379 (5th Cir. 1972):

> The fact that a seaman is "answerable to the call of duty" imports a legal obligation both on the part of the seaman, enforceable by the shipowner, and on the part of the vessel, to pay him and provide maintenance and cure in times of illness or injury, enforceable by the seaman in courts of admiralty. It is because the seaman remains bound to the vessel that the vessel and the shipowner are correspondingly obligated to him for maintenance and cure in case of injury. These reciprocal obligations determine an individual's status as a seaman, and whether the seaman is in the service of his vessel.

Id. at 385. Under the facts of this case, neither of these reciprocal obligations existed. Accordingly, plaintiff is not entitled to maintenance and cure.

No evidence was offered as to plaintiff's claim for wages, and all the testimony indicated that plaintiff had been paid in full in accordance with his clear agreement with the Captain. There is therefore no basis for an award of damages for wages.

The above opinion constitutes the Court's finding of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ. P. Counsel for defendant shall submit a form of judgment in accordance with the above ruling within three (3) days.

2. The Court's earlier determination that Charles Coram, like plaintiff, was not a member of the Gem's crew at the time of the assault provides an alternative basis for denying recovery on the unseaworthiness count. The shipowner's warranty is only that he will provide crew members equal in disposition to the ordinary men of the calling. He does not warrant the disposition of one who is not a crew member at the time of the assault.