Sean FOUNTAIN, Plaintiff,

v.

JOHN E. GRAHAM & SONS, Defendant.

JOHN E. GRAHAM & SONS, Plaintiff,

v.

Sean FOUNTAIN, Defendant.

Civ. A. No. 90–0495–P–M.

United States District Court,
S.D. Alabama, S.D.

March 3, 1993.

J. Hodge Alves, III and G. Hamp Uzzelle, III, Mobile, AL, for plaintiff.

David Paul Bains and Jack W. Harang, New Orleans, LA, for defendant.

## ORDER GRANTING GRAHAM'S MOTION FOR JUDGMENT AS A MATTER OF LAW

PITTMAN, Senior District Judge.

These cases are before the court on John E. Graham & Sons' (Graham's) motion for judgment as a matter of law at the close of Fountain's evidence at trial on the issue of liability. For the reasons set forth below, the motion is GRANTED as to all of Fountain's claims.

Graham had filed for a declaratory judgment in this court. That case was consolidated with a suit brought by Fountain, originally filed in the Eastern District of Louisiana, raising claims for Jones Act negligence, unseaworthiness, and maintenance and cure against Graham.

### I. SUMMARY OF THE EVIDENCE

The claims in this case arose from an incident on board the M/V BARRY G, a vessel owned by Graham. The BARRY G was tied to a buoy in the Gulf of Mexico late during the night of March 16, 1990 and early the following morning. The boat was on standby duty, in case any emergency arose on oil platforms serviced by Graham, or on other Graham boats. The BARRY G had a crew of four: Captain Mike Quint, Second Captain Sean Fountain, Engineer Willie McRand, and Deckhand Clancy Pettway. Quint and Fountain are white, and McRand and Pettway are African Americans. McRand is about 5 feet 10 inches tall, and weighs around 175 pounds. Fountain is about 6 feet two inches tall and weighs around 200 pounds.

The plaintiff contends that the incident which occurred between him and McRand, a fellow seaman, arose out of a *dispute* over the temperature *setting* on the *air conditioner*, and that this *was the cause* of the pushing and shoving, and blows he claimed were struck by McRand. The plaintiff is correct that the dispute first arose because of the temperature setting; however, the evidence is undisputed that only mouthing and foul language occurred before the pushing, shoving, and alleged blows. Such language is not uncommon among seamen aboard vessels, and was not uncommon aboard this vessel. The evidence is undisputed that pushing, shoving, and alleged blows came after the plaintiff, a white person, made racial slurs to McRand, a black person. It is *unquestionable* that these *racial slurs* were the *cause* of the *incident* on which the plaintiff's claim is based.

This case from the selection of the jury has had an undercurrent of racism. There were 14 jurors seated, from which the jury of eight were to be selected, with three strikes to each side. The plaintiff attempted to strike two of the four blacks. The defendant made objections based on violations of *Batson* and its progeny. The reasons for striking the blacks were obviously pretextual and without merit. They were restored to the panel. This resulted in a jury being seated of four blacks and four whites.

Throughout the trial, both attorneys for the plaintiff repeatedly violated the court's sidebar orders with reference to the sustaining and over-ruling of objections; so much so that the defendant's attorney, during the third day of the trial, charged the plaintiff with attempting to seek a mistrial.

The court has set this out so that the reviewing court can have an understanding of the totality of the underlying racial issues in this case. These actions of the attorneys for the plaintiff do not directly bear on whether or not they had presented sufficient evidence for the case to go to the jury but illustrate the racial matter, the racial slurs by the plaintiff which are the core of this incident, i.e., the real origin of the alleged assault and battery by McRand, a black seaman aboard the vessel, upon the plaintiff, a white person and McRand's superior.

■ There are four different versions of the incident. There are two different standards of review for a motion for judgment as a matter of law involved in this case. On the Jones Act claim based on *assault and battery*

by a fellow seaman, on the *foreseeability* issue, the *standard* for granting judgment is *more stringent* than the *standard* on the *seaworthiness* and *maintenance and cure* claims. The .court considers the plaintiff's version of the incident to be the most favorable to him; therefore, his version of the incident will be set out first.

### A. Testimony of Second Captain Fountain

Sean Fountain was first hired by Graham in August of 1988, as a Second Captain. He was involved in a car wreck in October of 1990. Fountain suffered whiplash and a dislocated hip in this wreck, for which he was treated by a physical therapist. Fountain was discharged by Graham for failing a drug screen after the wreck. Fountain maintains that he failed the screen because he forgot to tell the examiner that he was taking Tylenol 3, though Fountain was aware that Tylenol 3 was a narcotic and Graham had a policy against taking narcotics.

Fountain then went to work on a non-Graham boat. Fountain alleges that he was laid off from this boat because of a misunderstanding with the First Captain.

Fountain alleges that he had received no reprimands regarding cooperation with other crewmen during his first stint at Graham. Graham had black First Captains, and Fountain had served under them. According to Fountain, McRand is the only African American with whom he has ever had a problem.

Fountain returned to Graham during late January or early February of 1990. He served part of a hitch on the BARRY G with McRand. He first said that he had no problems with McRand on this hitch. Fountain later testified differently. He then said that McRand disobeyed a direct order from him regarding a water line. Fountain wrote and signed a performance report on McRand for this hitch. No reference or inference was made of any disobedience or bad attitude. Until the incident on the second hitch, McRand had exhibited no violent propensities and was not easily riled.

During Fountain's second hitch on the BARRY G—the hitch on which the scuffle occurred—there were disagreements regarding the temperature. After a meeting with the crew, Captain Quint ordered that the thermostat be set to 72 degrees and left at that temperature. Fountain alleges that—both before and after this meeting—he reset the temperature to 72 after it had been set to 80. Fountain did not believe that he was disobeying Quint's orders in doing so.

On the night of the 16th, Fountain woke up angry and irritated because it was too hot. He had not planned to rise before 6 a.m., but woke up because it was too hot. Fountain went below to the crew quarters to lower the thermostat. He testified that he did not go back to bed because he wanted to see if McRand would obey his orders regarding the thermostat. Fountain told McRand that it was not possible for everyone to be comfortable and that he, Fountain, had set the temperature and McRand was to leave it alone. McRand cursed and replied that "I wouldn't freeze for anyone." Fountain had no previous problems with McRand on this hitch. Fountain claims that, after he tried to reason with McRand, he told McRand that McRand would be put off the boat. McRand replied that Fountain had no right to do so.[1]

Fountain alleges that he then lost his temper and cursed, saying to McRand "fuck you, you black ass."[2] Fountain testified that McRand then threw an apple at Fountain and lunged, pinning Fountain to a table in the galley. According to Fountain, McRand also confessed to raising the thermostat. Fountain testified that his hands were on the table during the entire incident, and that he never threw a punch. According to Fountain, McRand pinned him to the table, hold-

---

1. Quint testified that Fountain had no authority to put anyone off the boat.

2. Fountain's attorney, in response to a query from the court, stated that Fountain was testifying that he made this remark after Captain Quint came into the galley. However, from the context of the testimony, it is clear that Fountain is speaking about the time before Quint's entrance. This court repeatedly remonstrated plaintiff's attorneys for asking leading and suggestive questions. This appeared to be a suggestion to the plaintiff. Fountain's testimony, and not that of his counsel, is evidence for this court to consider.

ing him with one hand and punching him with the other.

McRand got off Fountain because Pettway, who had come up from the crew quarters, told McRand to stop. McRand went towards the galley. Fountain alleges that he went to wake up Quint. He admitted that McRand did not do or say anything, when Fountain passed him on the way to Quint's quarters.

Quint came out, and all four men were in the galley. Quint was slow-moving because he had just awakened. According to Fountain, McRand lied to Quint and told Quint that Fountain had called him a "nigger."

Fountain was still angry, and told McRand that McRand would pay for the incident. Fountain then called McRand either a "black mother fucker" or a "black ass." Fountain claims that McRand attacked again; that McRand flew at Fountain, while Fountain was retreating; that McRand pushed Fountain and Fountain hit the bench and then fell to the floor; that McRand was on top of Fountain and the two men almost went down the stairwell. He said McRand stopped when Pettway said "it's not worth it."

Fountain left to start the engines because he wanted to get off the boat. Fountain threw off a bow line which weighed around 100 pounds when wet. Fountain wanted to go onto the platform, but, he was instead released to the GLEN AUTRY G, another Graham boat.

Fountain admitted that he had a duty to Graham to maintain harmony aboard the BARRY G. He admits that he breached this duty, because, according to him, it is more important to stamp out insubordination than to maintain harmony on the ship. If Quint had given Fountain an order not to use racial slurs—an order which Fountain denies receiving—disobedience of such an order would breach a duty Fountain owed to Graham. If a Second Captain provoked a fight, that would breach a duty Fountain owed to Graham.

### B. Testimony of Captain Quint

Mike Quint was, at the time of the incident, the Captain of the BARRY G. He still works as a Captain for Graham.

Sometime before the incident, Fountain made a racial epithet, that "everyone should own a nigger." Quint was shocked, as he saw no relationship between this remark and their conversation at the time. He ordered Fountain not to use such language on the ship.

On the night of the 16th, Quint went to bed sometime between 10:30 and 11:00 p.m. The BARRY G was standing by, tied to a buoy, and the crew had little to do. Quint became aware of an altercation when he was awakened by Pettway, who knocked on his door and said "they're fixing to fight."

When he came out of his room, Quint saw Pettway. He also saw McRand, who had come to the door. McRand said "I just can't get along with the son of a bitch," meaning Fountain.

Fountain was standing near the stairs, about three to four feet from McRand, when Quint came out of his room. McRand called Fountain a "son of a bitch." Both men were cursing. Fountain pointed his finger at McRand and called him a "black mother fucker."

When Fountain called McRand a "black mother fucker," McRand's actions changed. McRand pushed Fountain. Fountain took steps backward. McRand took steps forward, but did not continue to push Fountain. Fountain ended up on a padded bench, from which he slid to the floor, which was about 18 inches below. Quint never saw either man throw a punch, strike a blow or kick.

Fountain wanted to go onto a nearby oil platform. Quint said no. Fountain carried his own bags to the edge of the boat, and climbed onto the GLEN AUTRY G, another Graham boat, without difficulty.

In Quint's opinion, Fountain caused the fight by not getting along with others, and by using racial slurs in direct contravention of Quint's orders.

### C. Testimony of Engineer McRand

McRand is still employed by Graham as an engineer. During the hitch in question, McRand was on the noon to midnight watch. He was responsible for maintaining a radio

watch, and making periodic visual inspections of adjacent oil platforms.

After midnight, McRand was shaving and watching TV in the TV room. McRand had gone below and awakened Pettway, but Pettway was still dressing and had not come up from his quarters.

McRand was shaving in the head when Fountain came out of the captain's quarters which Fountain shared with Quint. Fountain asked McRand about the thermostat. McRand told Fountain that Quint wanted to be notified before anyone changed the thermostat setting. Fountain went downstairs to the crew quarters where the thermostat was located.

Fountain came back up and continued to complain about the thermostat and the temperature.

Both men were cursing. McRand went to the galley to get something to eat. He got an apple out of the refrigerator.

Fountain then called McRand a "black mother fucker." This made McRand very angry, and he threw the apple at Fountain. After the apple missed Fountain, McRand lunged at Fountain from a distance of about 5 feet. McRand may have grabbed Fountain's collar, but he did not hit Fountain.

When Pettway came in, McRand left Fountain alone, without any physical action by Pettway.

According to McRand, he then knocked on Quint's door and entered to awaken Quint.

McRand then went into the galley, while Fountain remained in the TV room. McRand and Pettway were talking when Quint came out.

Fountain came towards McRand, pointing his finger and threatening him. Fountain made racial remarks and again threatened to put McRand off the boat. Fountain said to McRand "fuck you, you black ass." McRand knocked Fountain's hand away.

McRand grabbed Fountain and Fountain went backwards. Fountain went down onto the cushioned bench.

Fountain rolled off the bench and onto the floor. McRand stood over Fountain with his hand raised. Either Quint or Pettway told McRand to "stop," and he did so. The entire incident had taken a couple of seconds. McRand did not strike Fountain.

### D. Testimony of Deckhand Pettway

Clancy Pettway had worked for Graham for around 18 months, first as a deckhand and then as an engineer. He no longer works for Graham.

Pettway was awakened by McRand sometime after midnight, and told it was time for Pettway's watch. As Pettway was getting dressed, McRand went back upstairs. Pettway's door was open at this time, and he heard words from upstairs.

When Pettway came upstairs, he saw Fountain sitting at the bench next to the TV, facing McRand. Pettway heard Fountain call McRand a "black mother fucker." McRand then threw an apple at Fountain. Pettway did not see McRand throw a punch, but McRand was preventing Fountain from standing up. McRand was not touching Fountain.

Pettway went to wake up Quint. McRand stood just behind Pettway while Pettway was knocking on Quint's door.

Pettway told Quint that Fountain and McRand were arguing about the air conditioner. Quint followed Pettway towards the lounge. McRand and Fountain were facing each other. Quint was trying to find out what was going on.

Fountain went to the bow of the ship and pulled in the line which had tied the ship to the buoy. This happened about two to three minutes after the incident.

The BARRY G then went to the place where another Graham standby boat was waiting. Fountain carried several of his own bags, each of which weighed around 25 to 50 pounds, off the boat. Fountain tied off one end of the BARRY G.

### II. FOUNTAIN'S JONES ACT CLAIM

■ Graham is entitled to judgment as a matter of law on Fountain's Jones Act claim. A shipowner is liable to a seaman under the Jones Act for a shipboard assault

by a fellow seaman only if: (1) the assault was committed by the plaintiff's superior for the benefit of the ship's business, or (2) the master or the ship's officers failed to prevent the assault when it was foreseeable. *Miles v. Melrose*, 882 F.2d 976, *reh'g en banc denied* 888 F.2d 1388 (5th Cir.1989).

■ A shipowner is entitled to judgment as a matter of law against a seaman on a Jones Act claim for an assault only when there is a complete absence of probative facts in support of the seaman's claim on the foreseeability issue. *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1544 & n. 4 (11th Cir. 1989); *Johnson v. Bryant*, 671 F.2d 1276, 1279 (11th Cir.1982).

■ Under the first theory of Jones Act liability, the person committing the assault must have some authority over the plaintiff in order for the plaintiff to recover. *Lykes Bros. Steamship Co. v. Grubaugh*, 128 F.2d 387, 391, *modified on other grounds* 130 F.2d 25 (5th Cir.1942) (chief engineer of the ship had no authority over the steward whom he assaulted, thus shipowner could not be held liable). *Accord Kable v. United States*, 169 F.2d 90, 92 (2d Cir.1948), *appeal after remand* 175 F.2d 16 (2d Cir.1949) (shipowner, United States, not liable when chief engineer assaults chief officer). There is no evidence that Fountain was not McRand's superior officer. Since Fountain, the plaintiff, was the superior of McRand, the alleged assailant, there can be no liability on the part of Graham for the assault on Fountain under this theory.

■ Fountain is not entitled to go to the jury under the second prong of the Jones Act analysis. There is no evidence that Quint could have reasonably[3] foreseen or prevented the assault.

Taking only the evidence most favorable to the plaintiff, i.e., the plaintiff's testimony, Captain Quint could not have reasonably[4] foreseen or prevented the assault.[5] On this trip, McRand and Fountain had been on the same watch most of the time, and no problems had arisen between the two men. Fountain testified that, until the incident, McRand had exhibited no violent propensities and was not easily riled. There is no evidence that the defendant had notice of any violent propensities of McRand, nor that he had previously exhibited such. Fountain claims he awakened Quint in the middle of the night. When Quint came out of his quarters, Fountain, McRand, and Pettway were all in the galley. Fountain admits that he was extremely angry at this time, and told McRand that McRand would pay for his previous actions. Fountain admits that, until he lost his temper and made a racial slur, "fuck you, you black ass," McRand did not attack him. Fountain alleges that McRand then "flew" at him. Fountain admits that Quint was slow-moving because Quint had just awakened. While Fountain claims that Quint could have prevented the scuffle by separating Fountain and McRand, or by sending McRand below, Quint could not have reasonably[6] foreseen Fountain's racial epithet which triggered McRand's lunge. A captain awakened in the middle of the night cannot be held responsible for his failure, under these circumstances of a sudden emergency, to act more quickly and try to prevent a fistfight. *E.g. Taylor v. Bair*, 414 F.2d 815 (5th Cir.1969); *Kelley v. Safeway Stores, Inc.*, 267 F.2d 683 (D.C.Cir.1959).

---

3. This is with reference to what constitutes negligence, i.e., what a reasonably prudent person could or could not have foreseen under the same or similar circumstances. It is not with reference to the standard of proof, i.e., on the foreseeability issue the standard is stricter than that in the unseaworthiness and maintenance and cure claims which are what a reasonable person would find.

4. *See* n. 3, *supra.*

5. During oral argument, Fountain's counsel raised an additional theory of liability, that Quint was negligent in running a "lax" ship. However-

er, this theory had not been previously raised by the plaintiff, and is thus not before the court now. In this court's standing pretrial order, both parties are notified that their joint pretrial statement will be the controlling legal document in the case, and that "dispositive legal issues not set out as legal issues in the pretrial response will not be considered." Thus, the attempt of Fountain's counsel to raise this issue for the first time during oral argument on the directed verdict motion is untimely and in direct violation of this court's pretrial order.

6. *See* n. 3, *supra.*

Moreover, misconduct by a ship's officer, such as Fountain, entirely relieves the shipowner of liability under the "*Walker* doctrine." *Walker v. Lykes Bros. Steamship Co.,* 193 F.2d 772, 774–75 (2d Cir.1952). *See Villers Seafood Co. v. Vest,* 813 F.2d 339, 342 (11th Cir.1987) (declining to extend *Walker* to prevent recovery by officer where officer was merely negligent). In *Walker,* the Second Circuit, in an opinion by Judge Learned Hand, ruled that although contributory negligence was not available as a bar to recovery under the Jones Act, an officer's failure to ensure that a defective catch in a filing cabinet was repaired could bar the officer's recovery under the Jones Act when a drawer in the cabinet burst open, injuring him. The Second Circuit remanded the case for a determination of whether the officer had breached an independent duty to the shipowner to keep the ship in good repair. If the officer had breached this duty, he would be barred from recovering under the Jones Act.

In the case at bar, Fountain admitted that he had a duty to Graham to refrain from provoking or engaging in a fight on board ship. Fountain willingly undertook this duty in entering into his contract with Graham, and signed a form to that effect in February 1990, about a month before the scuffle occurred. Fountain admitted breaching this duty, though, in his opinion, McRand first breached this duty by not following Fountain's orders. Fountain could have avoided the scuffle if he had not breached his duty to Graham. He testified that he felt it was more important to maintain discipline than to uphold this duty and avoid a fight. Under the *Walker* rationale, Fountain cannot recover for Graham's Jones Act negligence when Fountain's breach of duty, loss of temper and racial slurs, were the cause of the scuffle.

For the above reasons, Graham is entitled to judgment as a matter of law on Fountain's Jones Act claim. There is a complete absence of probative facts which would entitle Fountain to go to the jury on this claim.

### III. FOUNTAIN'S UNSEAWORTHINESS CLAIM

Fountain is not entitled to go to the jury on his unseaworthiness claim. A vessel is unseaworthy if a seaman has such a savage disposition as to endanger the others on the ship, i.e., if he was not equal in disposition to ordinary men of that calling. *Boudoin v. Lykes Bros. Steamship Co.,* 348 U.S. 336, 340, 75 S.Ct. 382, 385, 99 L.Ed. 354, *amended* 350 U.S. 811, 76 S.Ct. 38, 100 L.Ed. 727 (1955) (shipowner liable when drunk seaman who was disposed to fighting and belligerence, after drinking party on board ship, woke sleeping plaintiff and attacked him with a bottle). *Boudoin* has been explained as holding a shipowner liable only if a seaman has a savage and vicious nature. *Miles, supra* 882 F.2d at 981. A seaman's vicious nature may be proved either by independent evidence regarding his disposition or by direct evidence that he launched a vicious and unprovoked attack. *Id.*

This court grants Graham judgment as a matter of law on Fountain's unseaworthiness claim because no reasonable jury could have found for Fountain on that claim. A directed verdict motion against an unseaworthiness claim should be granted where no reasonable jury could find for the plaintiff. *Bommarito v. Penrod Drilling Corp.,* 929 F.2d 186, 189 (5th Cir.1991). *See Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc). In determining whether there exists sufficient evidence to allow a case to go to a jury following a motion for directed verdict, the court should consider all the evidence, not just the evidence which supports the non-movant's case. *Gregory v. Massachusetts Mutual Life Ins. Co.,* 764 F.2d 1437, 1440 (11th Cir.1985).

The stricter standard which applies to Jones Act claims, such as considered above, does not apply to unseaworthiness claims. *See Boeing, supra.* This is the case even when unseaworthiness claims and Jones Act claims are joined in the same suit. *Comeaux v. T.L. James & Co.,* 702 F.2d 1023, 1024 (5th Cir.1983); *Allen v. Seacoast Products, Inc.,* 623 F.2d 355, 359 (5th Cir.1980).

Mere fisticuffs and shipboard brawls do not create shipowner liability. *See Claborn v. Star Fish & Oyster Co.,* 578 F.2d 983 (5th Cir.1978), *cert. denied* 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d 494 (1979). Thus, it is

Fountain's burden to prove that McRand was "a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature." *Boudoin, supra* 348 U.S. at 340, 75 S.Ct. at 385; *McConville v. Florida Towing. Corp.*, 321 F.2d 162, 164 (5th Cir.1963). There is no evidence that McRand, at that time or before, had a wicked or violent disposition. Fountain testified to McRand's peaceable disposition. There is no evidence of a vicious and unprovoked assault. The assault was, under the plaintiff's version, no more than mere fisticuffs. Fountain provoked the assault. He admitted that McRand did not lunge at him until Fountain lost his temper and made racial slurs.

Cases which have found that a seaman has a savage disposition based on the fact that the assailant savagely and without provocation attacked the plaintiff inevitably contain an egregious assault quite different from the scuffle in this case. Cases which hold the shipowner liable are, without exception, cases where the assailant uses a deadly weapon or dangerous instrument in the assault. *Clevenger v. Star Fish & Oyster Co.*, 325 F.2d 397, 402 (5th Cir.1963). *Compare Miles, supra* (seaman inflicted 62 stab wounds on plaintiff's decedent, some after decedent was immobilized and no longer able to defend himself); *Claborn, supra* (sudden attack with ten-inch long, very sharp bait knife by assailant who had been drinking for several days and had gone without sleep for nearly a week); *Smith v. Lauritzen*, 356 F.2d 171 (3d Cir.1966) (longshoreman attacked with cargo hooks); *Clevenger, supra* (sudden attack with four-foot long, sharp ice chisel known as "devil's fork"); *Handley v. United States*, 157 F.Supp. 616 (S.D.N.Y.1958) (after making several threats, large drunk assailant stabbed plaintiff with pocket knife); *Thompson v. Coastal Oil Co.*, 119 F.Supp. 838 (D.N.J.1954), *rev'd on other grounds* 221 F.2d 559 (3rd Cir.1955), *aff'd* 350 U.S. 956, 76 S.Ct. 345, 100 L.Ed. 832, *vacated* 350 U.S. 985, 76 S.Ct. 471, 100 L.Ed. 852, *and rev'd* 352 U.S. 862, 77 S.Ct. 90, 1 L.Ed.2d 73 (1956) (assailant struck plaintiff three times over the head with 2a meat cleaver), *with, Jones v. Lykes Bros. Steamship Co.*, 204 F.2d 815 (2d Cir.1953), *cert. denied* 346 U.S. 857, 74 S.Ct. 72, 98 L.Ed. 370, *reh'g denied* 346 U.S. 905, 74 S.Ct. 217, 98 L.Ed. 404 (1953), *and reh'g denied* 348 U.S. 960, 75 S.Ct. 447, 99 L.Ed. 749 (1955) (assailant savagely beat plaintiff, severely injuring his hip). There is no evidence that McRand attacked Fountain in such a manner. Fountain's unseaworthiness claim is due to fail.

■ Fountain's provocation of McRand also defeats his unseaworthiness claim. Evidence of provocation—such as racial and ethnic slurs—tends to show that the assailant was not savage absent the provocation, thus the vessel was seaworthy. *Robinson v. S.S. Atlantic Starling*, 369 F.2d 69, 71 (5th Cir. 1966), *cert. denied* 386 U.S. 993, 87 S.Ct. 1309, 18 L.Ed.2d 339 (1967) (vessel not unseaworthy where the assailant was quiet, peaceful, and efficient until plaintiff called him "dog," "Chilean Red," and "Communist Dog"). Like the assailant in *Robinson*, the evidence in this case is uncontradicted that McRand was hard-working and peaceable until provoked by Fountain's threats, loss of temper, and racial slurs against him. As a result, Graham is entitled to judgment as a matter of law on Fountain's unseaworthiness claim.

## IV. FOUNTAIN'S CLAIMS FOR MAINTENANCE AND CURE

■ Fountain may not recover for maintenance and cure since his own willful misconduct led to the fight which caused his alleged injuries. Willful misconduct by a seaman relieves the shipowner from the duty to provide maintenance and cure. *McConville, supra* 321 F.2d at 165. *See Aguilar v. Standard Oil Co.*, 318 U.S. 724, 731, 63 S.Ct. 930, 934, 87 L.Ed. 1107 (1943) (willful misbehavior or deliberate act of indiscretion deprives seaman of right to maintenance and cure). As a result, Graham is entitled to judgment as a matter of law on Fountain's claims for maintenance and cure.

Furthermore, maintenance and cure was paid until discontinued on the advice of counsel. The evidence is uncontradicted that the plaintiff abused drugs and alcohol, which forestalled his maximum cure, after that time and maybe before.

This court grants directed verdict for Graham on Fountain's maintenance and cure claims because no reasonable jury could reach a contrary decision. The directed verdict standard on a maintenance and cure claim is the same as that for other claims arising out of general maritime law, i.e., the reasonable person standard. *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n. 2, *reh'g denied* 656 F.2d 700 (5th Cir.1981), *cert. denied Taylor Diving & Salvage Co. v. Gaspard*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982). The higher "complete absence of probative facts" standard which applies to a grant of directed verdict under the Jones Act does not apply to claims for maintenance and cure. *Id.*

For the above stated reasons, it is ORDERED, ADJUDGED, and DECREED that judgment be and hereby is entered in favor of John E. Graham and Sons and against Sean Fountain on Fountain's claims for Jones Act negligence, unseaworthiness, and maintenance and cure.